Moncure, P.
The petitioner does not claim his discharge from imprisonment upon the ground that the Legislature had not a right to impose the tax, for the non-payment of which he was arrested; nor upon the ground that he did not use and enjoy the privilege on which the tax was imposed; nor upon the ground that he has paid the tax, or any part of it; nor upon the ground that, at the time of his arrest, he had any property out of which the tax, or any part of it, could have been made by a levy thereon. He does not even show, or say, that he has not, in his pocket, or at his command, the means of paying the tax. But he places his defence upon the grounds : First. That the law authorizing an arrest and imprisonment in such cases is unconstitutional and void, because contrary to the constitutions both of the United States and of this State. *185 Secondly. That it does not appear that the facts necessary to authorize the appointment of an assistant commissioner of the revenue existed in this case; and, if they did, and the assistant was duly appointed, he had no authority to make the assessment, which could only have been legally made by the principal commissioner himself; and, if he had such authority, he could exercise it only in the name of his principal, which should, but does not, appear on the face, or at the foot, of the certificates of assessment. And, Thirdly. That, while the said certificates were in the hands of the sheriff’ of Henrico county for collection, there was ample personal property of the petitioner, Byrne, for their payment, on which they might have been levied, and ought to have been levied, before any arrest of the person was made; and long prior to the arrest, the said sheriff actually made a levy upon the personal property of Byrne, more than enough to satisfy the whole claim, and advertised it for sale.
I will now proceed to consider these three grounds of defence in the order above stated; and,
ITirst, as to the constitutionality of the law under which the petitioner was arrested.
That law is the 63d section of chapter 57 of the acts •of the General Assembly, passed at the session of 1866-67, Sess. Acts, p. 849, and is in these words :
“ 63. Within ten days after a commissioner of the revenue shall have granted a certificate to obtain a license, he shall deliver to the sheriff or other collector of the taxes on such licenses, a list of all such certificates, as far as he may have progressed with the same; which list shall be the guide of the sheriff or collector in collecting the taxes imposed by law on such license. If the taxes be not paid, the sheriff or collector shall distrain, immediately upon the receipt of such list, for the amount with which any person may have been assessed; and he may sell, upon ten days’ notice, so *186 much of such person’s property, subject to distress, as-may be necessary to pay the taxes so assessed, and the costs attending its collection. If the sheriff or collector shall be unable to find sufficient property to satisfy the taxes so assessed, and the same shall not be immediately paid, the said sheriff or collector shall arrest the person so assessed, and hold him in custody until the payment is made, or until he enter into bond, with sufficient security, in a penalty at least double the-amount of the taxes so assessed, conditioned for his-appearance before the Circuit court of his county or corp oration, to answer to such action of debt, indictment or information as may be brought against hipa,, and to satisfy, not only the fine imposed, but to pay the taxes assessed; and it shall be lawful for the court, upon the trial of such action of debt, indictment or information, to render judgment upon such bond for the fine imposed and the taxes which may be assessed.”
It is contended that this law is contrary to Article V. of the amendments to the constitution of the United States, which declares that no person shall “be deprived of life, liberty, or property without due process of law; ” and is also contrary to that part of clause 10 of the Bill of Bights, being Article I. of the constitution of Virginia, which declares that no man shall “be deprived' of his liberty except by the law of the land or the judgment of his peers.”
In regard to the provision of the constitution of the United States above referred to, it is enough to say that it “was designed as a limitation.of the powers of the national government, and is inapplicable to the legislation of the States.” Nelson C. J. in Taylor v. Porter & Ford, 4 Hill’s R. 140; citing Barron v. The Mayor, &c. of Baltimore, 7 Peters U. S. R. 243; Livingston v. The Mayor, &c., of New York, 8 Wend. R. 85; and 2 Cow. R. 818, and note (c). Then,
*187 Is the law in question contrary to that part of the Bill of Bights of Virginia which declares that no man shall “be deprived of his liberty, except by the law of the land or the judgment of his peers?”
That a man may be deprived of his liberty by the law of the land, is conceded by the very terms of the provision just mentioned. That he cannot “be deprived of his liberty except by the law of the land,” necessarily implies that he may be deprived of it by the law of the land; and this is certainly an undeniable fact. Our Code contains many laws by which a man may be deprived of his liberty, and such laws are enacted every year. At the same time it must be admitted that these words of the constitution, “law of the land,” do not include every enactment which has the form of law. In the language of Bronson J., in Taylor v. Porter, 4 Hill’s R. 140, 146, they “ do not mean a statute passed for the purpose of working .the wrong. That construction would render the restriction nugatory, and turn this part of the constitution into mere nonsense. The people would be made to say to the two houses: ‘you shall be vested with the legislative power of the ..State, but no one shall be’ deprived, &e., ‘ unless you pass a statute for that purpose.’ In other words, ‘you shall not do the wrong unless you choose to do it.’ ” In the language of Mr. Webster, in his celebrated argument in the Dartmouth college case, 5 Webster’s Works, 487, 488: “The meaning is” (speaking of the provision in the constitution of the United States,) “ that every citizen shall hold .his life, liberty, property, and immunities, under the protection of general rules which govern society. Everything which may pass under the form of an enactment is not, therefore, to be considered as the law of the land. If this were the case, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man’s estate to another, legis *188 lative judgments, decrees and forfeitures, in all possible forms, would be tbe law of the land. Such a strange construction would render constitutional provisions of importance, completely inoperative and void.”
What, then, is the meaning of these words, “law o'f the land,” in this connection, and do they embrace the law under consideration ? These are the questions we now have to dispose of.
The provision of our bill of rights in which these words are found, is similar to but not so extensive as the provision of the constitution of the United States before referred to; and a like provision is contained in the constitution of every State in the Union. The meaning of such a provision has been the subject of consideration and decision in many cases. The most important of them all seems to be the case of Murray’s lessee, &c. v. Hoboken Land and Improvement Co., 18 How. U. S. R. 272-286, decided by the Supreme court of the United States at December term, 1855. Mr. Justice Curtis delivered the opinion of the court, which was unanimous. In that case it was held, among other things, that a distress warrant issued by the solicitor of the treasury, under the act of Congress passed on the 15th of May, 1820 (3 Stats, at Large 592), is not inconsistent with the constitution of the United States; that it was an exercise of executive and not of judicial power, according to the meaning of those words in the constitution ; and that it is not inconsistent with that part of the constitution which prohibits a citizen from being deprived of his liberty or property without due process of law. “ The words ‘ due process of law/ (say the court) were undoubtedly intended to convey the same meaning as the words ‘by the law of the land/ in magna diaria. Lord Coke, in his commentary on these words (2 Inst. 50), says they mean ‘ due process of law.’ The constitutions which had been adopted by the seve *189 ral States before the formation of the federal constitution, following the language of the great charter more closely, generally contained the words 4 but by the judgment of his peers, or the law of the land(and this is, substantially, the language of the bill of rights of Virginia). The ordinance of Congress of July 13,1787, for the government of the territory of the United States northwest of the river Ohio, used the same words.” 44 That the warrant now in question” (the court further say) 44 is legal process, is not denied. It was issued in conformity with an act of Congress. But is it ‘due process of law?’ The constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are intended to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative, as well as on the executive and judicial powers of the government, and cannot be so construed as to leave Congress free to make any process 4 due process of law,’ by its mere will. To what principles then are we to resort, to ascertain whether this process, enacted by Congress, is due process? To this the answer must be two-fold. We must examíne the constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition, by having been acted on by them after the settlement of this country. We apprehend there has been no period, since the establishment of the English monarchy, when there has not been, by the law of the land, a summary method for the recovery of debts due to the crown; and especially those due from receivers *190 of the revenues. It is difficult, at this day, to trace, with precision, all the proceedings had for these purposes in the earliest ages of the common law. That were gummary and severe, and had been used for purposes of oppression, is inferable from the fact that one chapter of magna eharta treats of their restraint. It declares, “Ve, or our bailiffs, shall not seize any land or rent for any debt, as long as the present goods and chattels of the debtor do suffice to pay the debt, and the debtor himself be ready to satisfy therefor.” &c. “By the common law, the body, lands and goods of the king’s debtor were liable to be levied on to obtain payment. In conformity with the above provision of magna diaria, a conditional writ was framed commanding the sheriff to enquire of the goods and chattels of the debtor, and if they were insufficient, then to extend on the lands.” “But it is said that since the statute 33 Hen. 8, c. 39, the practice has been to issue the writ in an absolute form, without requiring any previous inquisition as to the goods. Gilbert’s Exch. 127. To authorize a writ of extent, however, the debt must be matter of record in the king’s exchequer,” &e.
After giving an account of the practice pursued at different times in England in such cases, the court say: “ This brief sketch of the modes of proceeding to ascertain and enforce payment of balances due from receivers of the revenue in England, is sufficient to show that the methods of ascertaining the existence and amount of such debts, and compelling their payment, have varied widely from the usual course of the common law on other subjects, and that as respects such debts due from such officers, ‘the law of the land’ authorized the employment of auditors, and an inquisition without notice, and a species of execution, bearing a very close resemblance to what is termed a warrant of distress in the act of 1820, now in question.
*191 It is certain that this diversity in “ the law of the land,” between public defaulters and ordinary-debtors, was understood in this country, and entered into the • legislation of the colonies and provinces, and more especially of the States, after the declaration of independence and before the formation of the constitution of the United States. Hot only was the process of distress in nearly or quite universal use for the collection of taxes, but what was generally termed a warrant of distress, issuing against the body, goods and chattels of defaulting receivers of public money, was issued to some public officer, to whom was committed the power to ascertain the amount of the default, and by such warrant proceed to collect it. Without a wearisome repetition of details, it will be sufficient to give one section from the Massachusetts act of 1786.” After giving which, the court refers to similar provisions contained in the acts of Connecticut, Pennsylvania, South Carolina, New York, Virginia and Vermont, passed before the formation of the constitution of the United States, and in the acts of Louisiana and the United States, passed since that period; and then say: “ This legislative construction of the constitution, commencing so early in the government, when the first occasion for this manner of proceeding arose, continued throughout its existence, and repeatedly acted on by the judiciary and the executive, is entitled to no inconsiderable weight upon the question, whether the proceeding adopted by it was ‘ due process of law.’ ” “ Tested by the common and statute law of England, prior to the emigration of our ancestors, and by the laws of many of the States at the time of the adoption of this amendment, the proceedings authorized by the act of 1820, cannot be denied to be due process of law, when applied to the ascertainment and recovery of balances due to the government from a collector of customs, unless there exists in the constitution some other pro *192 vision which restrains Congress from authorizing such proceedings. For, though ‘ due process of law ’ generally implies and includes actor, reus, judex, regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings (2 Inst. 47, 50; Hoke v. Henderson, 4 Dev. N. C. R. 15; Taylor v. Porter, 4 Hill R. 140, 146; Van Zant v. Waddel, 2 Yerg. R. 260; State Bank v. Cooper, Id. 599; Jones’ Heirs v. Perry, 10 Id. 59; Greene v. Briggs, 1 Curtis C. C. R. 311), yet this is not universally true. There may he, and we have seen that there are cases, under the law of England after magna charta, and as it was brought to this country and acted on here, in which process, in its nature final, issues against the body, lands and goods of certain public debtors, without any such trial; and this brings us to the question, whether those provisions of the constitution, which relate to the judicial power, are incompatible with these proceedings ?”
The court then proceed to examine this question, and arrive at the conclusion, that no such incompatibility exists. In the course of their remarks on this subject, they say : “As we have already shown, the means provided by the act of 1820 do not differ in principle from those employed in England from remote antiquity, and in many of the States, so far as we know, without objection, for this purpose, at the time the constitution was formed. It may be added, that probably there are few governments which do or can permit their claims for public taxes, either on the citizen or on the officer employed for their collection or disbursement, to become subjects of judicial controversy, according to the course of the law of the land. Imperative necessity has forced a distinction between such claims and all others, which has sometimes been carried out by summary methods of proceeding, and sometimes by systems of fines and penalties, but always in some way observed and yielded to.”
*193 I have made these long quotations, because the case from which they are taken is one of the highest authority, and seems to be conclusive of the main point of controversy in this case, and because the language of the court in that case expresses the views which I wish to present, much more strongly and aptly than I can do, by any language of my own. Many other cases might be cited in support of the same views, but I will refer to one or two of them only. In the State v. Allen, 2 McCord R. 55, Mr. Justice bTott says: “ This method of collecting taxes is as well established by custom and usage as any principle of the common law. A similar practice prevailed in all the colonies, from the first dawn of their existence; it has been continued by all the States since their independence, and had existed in England from time immemorial. Indeed, it is necessary to the existence of every government, and is based upon the principle of self-preservation.” “I think, therefore, that any legal process, which was originally founded in necessity, has been consecrated by time, and approved and acquiesced in by universal consent, must be an exception to the right of trial by jury, and is embraced, by the alternative, ‘ the law of the land/ Such I consider to be the summary proceeding allowed in the collection of taxes.” In McCarroll v. Weeks, 2 Tenn. R. 215, the court hold the following language, in sustaining the constitutionality of these summary tax laws : “ It is certainly true that they have the character of summary proceedings, and it is equally true that they must of necessity be so; for, if the government were necessitated to take the cautious and tedious steps of the common law,” “ it would cease to exist for want of money to carry on its necessary operations; loss of credit and a total extinction of the national faith, the basis of all regular government, must be the inevitable consequence.” See, also, 6 Monroe R. 430;. *194 9 Georgia R. 352; 11 Id. 82; 6 Missouri R. 64; 1 Halst. R. 352; 10 La. An. R. 764.
In Blackwell on Tax Titles, p. 176, edition of 1864, chapter 9, the writer says: “Where the-person against whom a tax has been legally assessed neglects or refuses to pay the tax voluntarily, after a notification and demand made by the collector in the manner prescribed by law, the necessities of the State compel a resort to coercive means. In some States the law requires the body of the delinquent to be arrested and imprisoned, in satisfaction of the tax.” Bassett v. Porter, 4 Cush. R. 487; Daggett v. Everett, 19 Maine R. 373; Rising v. Granger, 1 Mass. R. 47; Appleton v. Hopkins, 5 Gray’s R. 530. “In other States, the law requires the tax to be collected out of the personal estate of the delinquent if a sufficiency can be found to satisfy it. In South Carolina the statute thus marshals the remedies: 1. A distress of the personal estate of the delinquent; 2. The sale of the land; 3. The seizure and imprisonment of the body Kingman v. Glover, 3 Rich. R. 27). A violation of the order of remedies thus prescribed invariably renders the act of the officer illegal. It is the policy of the law to resort to the land itself only when all other remedies fail to enforce a satisfaction of the tax. The person or personal estate of the delinquent is regarded as the primary, the lánd the dernier, resort. The tax never becomes a charge upon the land until the other remedies have been exhausted.” “The law admits of no substitution or change in the order thus established. It is therefore held that the land of the delinquent cannot be sold in those States which authorize imprisonment, if his body can be found, nor can a resort be had to the land, in States where the personal estate is regarded as the primary fund, as long as a sufficiency of personal estate can be seized and sold in satisfaction of the tax: a sale of the land, under such circumstances, is illegal- and void.”
*195 I presume no one will contend, and I did not understand the learned counsel for the defendant in error as contending in this case, that the law in question is unconstitutional in authorizing the sheriff or collector to distrain the property of the person assessed with taxes, as therein mentioned, if they be not paid. The necessity of such a power, and its constant exercise from time immemorial, as we have seen, places its constitutionality on an impregnable basis. But it seems to be supposed that the law is unconstitutional in authorizing the sheriff or collector, if unable to find sufficient property to satisfy the taxes so assessed, and the same shall not be immediately paid, to arrest the person so assessed and hold him in custody until the payment is made, or until he enter into bond with sufficient security, as therein mentioned. Why should this power to arrest the person so assessed make the law unconstitutional any more than the power to distrain his goods? The ground of the objection is that a person cannot be deprived of his liberty except by the law of the land. But a person cannot be deprived of his property, any more than his liberty, except by the law of the land; and yet it is well settled, and must be admitted, that a person’s property may be seized for non-payment of his taxes, upon the mere assessment of the commissioner of the revenue, and without any judgment of any court against him. Why may not his person be arrested for the same cause, when the law expressly authorizes such an arrest? We have seen that the authorities place the seizing of the property, and arresting of the person of the tax debtor, on the same footing, in regard to the constitutional question we are now considering; and so they undoubtedly are. The power to arrest the person may not be so often given by tax laws as the power to distrain property; but a power to arrest the person is often given by such laws, and is sometimes necessary to make them efficient; and when *196 ever it is necessary, the Legislature, which is charged with the important duty of raising a revenue for the support of government, may constitutionally confer such a power. It is not contrary, as has been shown, to the provision of the Bill of Bights before referred to, nor is it contrary to any pther provision of the constitution. There is no provision in our constitution, as there is in some of the other State constitutions, jvhich forbids imprisonment for debt. And it is well known that, until a recent period, a person might be imprisoned in this State, not only on final process in a civil action, but on original process in a bailable action, by a mere endorsement by the plaintiff’s attorney on the process, requiring bail. And though the law has been changed in this respect, j-et the old law may at any time be restored, at the will of the Legislature. There is nothing in the constitution to prevent it. Even if imprisonment for debt were forbidden by the constitution, such a provision would not, I imagine, forbid imprisonment as a means of enforcing the payment of taxes, if the Legislature found it necessary to resort to such means in order to raise a revenue. But such a question does not arise in this case, and of course is not intended to be decided.
But it is objected that imprisonment may be perpetual under this law, as it makes no provision for the discharge of the prisonér, even though he be insolvent.
If this be true, it may show the law tó be harsh in its operation, but does not therefore show it to be unconstitutional. It may be a bad exercise of legislative discretion, but not an excess of legislative power. The courts may control the latter, but have nothing to do-with the former.
. In vindication of the law against this imputation of harshness it may, however, be said that no person is compelled to obtain a license, unless he chooses to-exercise the privilege for which it is required. He sees *197 the law and knows the terms on which alone he can obtain a license; and by obtaining it, assents to all those terms, so far at least as they may be constitutional. One of those terms is, that if the tax be not immediately paid, and the sheriff or collector be unable to find sufficient property to satisfy the tax, he is required to arrest the person assessed with the tax, and hold him in custody until payment is made, or bond given as prescribed by law.
The act in relation to the assessment of taxes on licenses, under which the assessment in this case was made, prescribes what is to be d'one where a person wishes to engage in a licensed business. It is his duty to apply to the commissioner of the revenue of the district where the business is to be prosecuted, for an assessment of the tax imposed by law on the license he desires to obtain. It is thereupon the duty of the commissioner to administer the oath required by the act, and deliver to such person a certificate showing the business which may be pursued, the place at which it may be prosecuted, and the amount of tax to be paid by such person for the licensed privilege. This certificate is required to be produced to the proper sheriff or collector, whose duty it is to receive the taxes named therein and grant to such person a receipt therefor written upon the certificate, which' certificate and receipt, made in conformity to law, are declared to be a license to prosecute the business named therein. Acts ■of Assembly 1866-67, p. 846, § 52.
In regard to the manufacture of wine, ardent spirits and malt liquors, it is provided, with certain exceptions immaterial to be stated, that there shall be a specific tax for the privilege of distilling or other manufacturing of wine, ardent spirits or malt liquors, and there ■shall also be a tax on the quantity thereof to be manufactured or distilled, which shall be stated in the license. Tf the person desiring such license make application *198 therefor, he shall state on oath the probable quantity, which, in his opinion, he will distill or manufacture ■ during the time the license is to continue, and the tax shall be assessed, as well for the specific amount as upon the quantity to be produced. If the application shall not be made to the commissioner for an assessment, he shall asses the specific tax as in other cases of default, and shall ascertain, upon the best information he can obtain, the probable quantity which the distillery will produce during the time the license will continue, and shall thereupon assess the actual rate per gallon provided for in the act. If the quantity to bo manufactured or distilled under such license shall have been made, and the person desires to make an additional quantity, he may apply for a new assessment and a new license for the additional quantity desired, which shall be granted upon the payment of the tax on the gallon, without the specific tax to distill or manufacture. Id. p. 837-8, § 25. The act affords ample redress against an erroneous assessment, by giving to the person aggrieved thereby a right, at any time within two years after it is made, to apply for relief to the-court in which the commisioner gave bond and qualified, and by making it the duty of the court thereupon to give such relief. Id. 853-4, § 79, and seq.
Under all these circumstances what good reason-has a person assessed with this tax to complain of the-severity of this law ? It is his duty to pay the tax for the privilege before he exercises it. If, in defiance of the law, he disregards his duty, and manufactures ardent spirits to any amount hepleases, without paying any tax therefor, and without having any visible property on. which it may be levied, can he complain that the law subjects him to arrest and imprisonment until the payment is made ? His pockets may be filled with the profits of the business, and there may be no way of reaching them but by arresting his person and holding him. *199 in custody. Without that only effectual means of getting the tax, the Commonwealth would be deprived of a most important source of revenue, which she can illy afford to spare. There is really no hardship in the case, and certainly none of which a person assessed with the tax has any just cause to complain. If it be settled that he may be arrested and imprisoned if he fail to pay the tax and have not sufficient visible property on which it can be levied, there will rarely, if ever, be any occasion for resorting to this remedy. The tax will almost always be paid, as it ought to be. If in any instance it should not be, and this remedy should be resorted to, the Legislature could and would interpose to discharge the prisoner whenever it was found that his continued imprisonment was not likely to produce the amount of the tax, or any part of it.
But it is said that the law is harsh, and indeed unconstitutional, in requiring the person arrested to give bond, &e., for his appearánce before the Circuit courts of his county or corporation, to answer to such action of debt, indictment or information as may be brought against him, and to satisfy, not only the fine imposed, but'the taxes assessed.
The law does not require him to give such a bond. He may discharge himself from custody by payment of the tax. What is said about the bond is for his benefit. He may give the bond, and obtain his discharge in that way, if he cannot, or does not choose, to pay the money. There is nothing unreasonable in the condition of the bond which he is thus authorized to give. He has incurred a fine, for which an action of debt, or an indictment, or an information lies, and he also owes the taxes assessed. The condition of the bond is not to pay the fine absolutely, but to answer to such action of debt, indictment or information as may be brought against him, and to satisfy the fine imposed; that is, the fine which may be imposed on the trial of *200 such action of debt, indictment or information; and a^so Pay the taxes assessed.
I therefore think the law under which the petitioner wag arrested is constitutional; and I will now proceed to consider the next ground of defence, which is,
Secondly. That it does not appear that the facts necessary to authorize the appointment of an assistant commissioner of the revenue existed in this case; and, if they did, and the assistant was duly appointed, he had no authority to make the assessment,' which could only have been legally made by the principal commissioner himself; and, if he had such authority, he could exercise it only in the name of his principal, which, should, but does not, appear on the face, or at the foot, of the certificates of assessments.
The law under which'the'assistant commissioner, who made the assessment in this case was appointed, is in these words: “ A commissioner, unable from sickness or other cause to perform the duties of his office, may, at his own expense, with the consent of the County or Corporation court, employ a person (approved by the court) to assist him. Such assistant, after taking the proper oaths, may discharge any of the duties of commissioner, and the principal and his sureties shall be liable for the faithful performance of such duties.” See p. 728, § 7.
Whether the facts necessary to authorize the appointment of an assistant commissioner existed in this case, was a question for the County court of Henrico to determine. That court accordingly determined that they did exist, by appointing John A. Eacho assistant commissioner, who qualified as such according to law; which appointment was made on the motion of Sidney W. Blankinship, the commissioner. And that determination is conclusive of the question, being a judgment of a court of competent jurisdiction, upon a subject matter within such jurisdiction. The said assis *201 tant was, therefore, duly appointed, and took the proper oaths; and he thereupon became expressly authorized by law to “ discharge any of the duties of the commissioner.” Of course he was authorized to make an assessment and grant a certificate to obtain a license. And he could do so in his own name, as assistant commissioner, without, necessarily, adding the name of the principal commissioner, either to the assessment or cirtificate. Being expressly authorized, as assistant (Commissioner, to perform any of the duties of commissioner, it seems to follow, as a matter of course, that he may certify, in his own name, as such assistant commissioner, that he did perforin them. It was a rule of the common law, that an under-sheriff, or deputy sheriff, acted only in the name of his principal. 8 Bac. Arb. Sheriff, H. 1. “To prevent disputes between sheriffs and their several deputies, which of them may have acted in serving of executions or process,” our statute, at a very early period, required, that, when any under-sheriff hath served any process; he shall subscribe Ms name, as well as that of his principal, to the return of such process. 1 Rev. Co. 1819, p. 283, § 31; Code of 1860, p. 284, § 27. But there is no such analogy between the offices of under-sheriff and assistant commissioner of the revenue, as to make it necessary, or proper, that the latter should act in the name of his principal. There is, in contemplation of law, but one sheriff, though many and different kinds of deputies. And, although an under-sheriff may perform the duties of the office generally, yet there are, or were, many duties of the office which the high sheriff could perform only in person: at least such was the case at common law.. 8 Bac. Abr. Sheriff, H. 3. But the assistant commissioner is expressly authorized, as we have seen, to “ discharge any of the duties of commissioner.” There seems to he no reason or propriety, therefore, in requiring the assistant commissioner to *202 act in the name of his principal in performing any of the duties of the office. In Hannel v. Smith,, 15 Ohio • B. 134, cited hy the counsel for the defendant in error, the law required that the list, which was thereby directed to be transmitted by the auditor of State to the county auditor, of all lands which had been forfeited for non-payment of taxes, should be certified and signed by the auditor of State, and have thereto affixed his seal of office. The list which was transmitted in that case was a letter signed “ Jno. Brough, auditor of State, by J. B. Thomas.” The court held the authority insufficient and the sale void, on three grounds: 1. The list was not certified to be correct. 2. It was not attested by the auditor or his chief cleric 3. It was not verified by the official seal of the auditor. The distinction between that case and this is too palpable to require further comment.
I will now proceed to consider the next and last ground of defence, which is,
Thirdly. That while the said certificates were in the hands of the sheriff of Henrico county for collection, there was ample personal property of the petitioner Byrne for their payment, on which they might have been levied, and ought to have been levied, before any arrest of the person was made; and long prior to such arrest, the sheriff actually made a levy upon personal property of Byrne, more than enough to satisfy the whole claim, and advertized it for sale.
It is not pretended that the petitioner had any property on the 3d of February, 1870, at the time of his. arrest. Nor that he had any property on which the-second certificate, bearing date the 24th day of November, 1869, could be levied at the time it came to the hands of the sheriff for collection. At that time the property of said Byrne was in the hands of the collector of internal revenue of the United States, under a levy made thereon for taxes due the United States, for the *203 payment of which taxes it was ultimately sold, and the proceeds (except a small balance, no doubt paid to Byrne,) were applied to such payment accordingly, he- ■ fore the arrest by the sheriff. And although it appears, from the statement of the said collector, that the sale made by him, as aforesaid, was not under the said levy, hut that he suffered that levy, for reasons which he states, to run out, and a few days thereafter, to wit: on the 4th of January, 1870, he made a second levy on the same property, under which second levy he made the sale aforesaid, it is not pretended, and certainly cannot he maintained, that because of the intermission of a few days between the two levies made by the collector, as aforesaid, there was such a liability of the property to a levy by the sheriff as to make his arrest of Byrne illegal. We may therefore well conclude that the arrest for the non-payment of the taxes assessed by the second certificate was lawful. So that, even if the arrest could not lawfully have been made for non-payment of the taxes mentioned in the first certificate, yet, as the arrest for non-payment of the taxes mentioned in the second certificate was lawful, the petitioner would not have been entitled to be discharged from custody on the writ of habeas corpus in this case; hut ought to have been remanded to custody until payment was made of said last-mentioned taxes, or until bond was given, as required by law.
But was not the arrest also lawful for the non-payment of the taxes mentioned in the first certificate, hearing date on the 15th day of October, 1869 ? I think that it was. It is true, it seems, that when that certificate came to the hands of the sheriff, the petitioner Byrne had sufficient property to satisfy said taxes,. which property was liable to be levied on, and was actually levied on, for the same. But it is also true, that very soon after such levy, and before the day fixed for the sale of the property under the said levy had arrived, *204 the same property was levied on .by the collector of in ternal revenue of the United States, for taxes due the • United States by the said Byrne; and when, on the day which had been fixed by the sheriff for the sale, he went to the premises of Byrne to make the sale accordingly, he was stopped from selling by some one connected with the United States internal revenue office, who stated that all the property levied on was in the hands of the government of the United States. The property levied on under the said first certificate was taken from the sheriff, and was sold by the collector of internal revenue for the government of the United States. The person who had been put in charge of the property levied on by the collector, and was in charge of it on the day advertized for said sale, pretended to be a government officer, and the collector acknowledged afterwards to the sheriff that he acted by his authority. After the said day fixed for said sale, the sheriff made no further levy or attempt at a levy. The United States held the property, and he did nothing more.
Uow, the question we have to decide is, not whether the government of the United States, or the government of this State, were entitled to priority of satisfaction out of the property thus levied on for the payment of the taxes due by Byrne to these two governments respectively; nor' whether the sheriff’ did not incur a personal liability to the government of the State for not having summoned a posse comitaius to take the property out of the hands of the government of the United States, or the revenue officers thereof; but whether the taxes due to the State of Virginia, for which this ineffectual levy was made, were so far satisfied by the force and effect of such levy, as that payment thereof could not be enforced by the arrest of the debtor, though at the time of such arrest he had not a particle of property upon which a levy could be made ? *205 That is the question; and I am clearly of opinion that it ought to he solved in the negative—that is, that the taxes due the State of Vii’ginia, for which the levy was made, have not been satisfied to any extent, or for any purpose, by such abortive levy, and that the arrest made was a lawful arrest, as well for the non-payment of those taxes as for the non-payment of the taxes mentioned in the second certificate.
Suppose, after the levy by the sheriff, the debtor himself had sold the property and applied it to his own use; or had removed it out of the reach of the sheriff; could the debtor then have said that the taxes were satisfied by the levy, or that there could be no arrest, because there had been a levy on property sufficient to satisfy the taxes ? Certainly not. And why can he any more say so, when the property has not been applied to the payment of the taxes due the State, which were levied thereon, but was taken by officers of the United States government and applied to the payment of taxes due by Byrne to that government? When the property was applied to the payment of taxes due by Byrne to the United States, it was applied to his use just as much as if the proceeds of the sale had been paid to him, and there can be no reason or justice in considering this property, at the same time, as a payment of the debt due by him to the State of Virginia; and thus giving him the benefit of a double payment with the same money. The debt of Byrne to the State is yet, in fact, unpaid. She may have a recourse against the sheriff and his sureties for his official default; but her recourse against her primary debtor is not satisfied, or at all impaired. All her remedies for the recovery of that debt remain in full force; and those remedies are: 1st. A right to distrain the property of the-debtor; and if the sheriff or collector is unable to find sufficient property to satisfy the debt, and the same is not immediately paid; 2dly. A right to arrest the person of *206 the debtor and hold him in custody until the payment is made or a bond be given, as aforesaid. When the arrest in this case was made, the debt existed and these remedies existed in full force; and the debtor having then no property on which a levy could be made, his arrest was lawful.
Suppose the sheriff had made no levy under either certificate, and the United States, or execution creditors of the debtor, had levied upon his property and applied it all to the payment of debts due to them: would the taxes due by him to the State have been considered as satisfied, because they might have been levied on the property in preference of the other debts, and because the sheriff, by failing to make such levy, may have incurred a personal liability to the Commonwealth ? Certainly not. In that case, clearly, the debt to her would still remain unpaid, and all her remedies against the debtor would still exist in full force. How does that case differ from this ? Here, it is true, there has been a levy, as it is called, for part of the debt. But did that injure the debtor ? Has he lost his property in consequence thereof? Has he even been deprived of it for a single day ? Certainly not. The property was not taken out of the debtor’s hands. Ho other person was even put in charge of it. It does not, indeed, appear that the debtor was informed of the levy by the sheriff. He seems to have merely made what I have heard called “ a sight levy: ” that is, he, merely looked at the property, and advertised it for sale. But before the sale, the United States made a levy on the same property; which, however, was no “ sight levy.” The collector seized the property, placed a keeper or guard over it, and directed him to allow no person to take or interfere with any part of it. At the time he made the first levy, he found the property in the possession of Byrne. He would not have levied on it if it had been in the sheriff’s custody. He saw the she *207 riff after he had made the seizure, and the sheriff then told him that he had made a prior levy. He never had any written notice of the levy by the sheriff. If he had found the property in the possession of the sheriff, he would have held it subject to the sheriff’s lien. It does not appear that Byrne gave the collector any notice that the property was subject to the sheriff’s levy, or claimed to have it applied to the payment of the taxes due the State, to protect his person from arrest. Perhaps he did not know that there had been such a levy; or, more probably, he considered it unimportant whether the property was applied to the payment of one or the other set of taxes, or in what order it was applied to their payment. Then, when the arrest was made, the matter stood, in every substantial respect, as if there had been no levy for any part of the taxes due the State. Even if the levy had been of an execution, it would not of itself have been a satisfaction of the debt. It is a satisfaction only when it produces the money, which is the fruit of the execution; or when it is so treated by the creditor, or the sheriff, who is in this respect his agent, as to occasion loss to the debtor, and then it is a satisfaction to the extent of such loss. If the property levied on be lost to the defendant by the misconduct or neglect of the sheriff, the execution is thereby satisfied to the extent of the value of the property; and the plaintiff can then only look to the sheriff for indemnity. Walker, &c. v. The Commonwealth, 18 Gratt. 13. So also here, if the sheriff had destroyed or wasted the property, or otherwise, by his misconduct or neglect in regard to it, had occasioned a loss to the debtor, the debt, to that extent, might, on the same principle, have been thereby satisfied. But such is not the case, and the matter stands precisely as if there had been no levy by the sheriff. It cannot be said that non constat there was any debt due to the United States for which a levy could be made. The pre *208 sumption is that there was such, a debt; and, at all events, that if they have done any wrong to the sup- • posed debtor, they will afford him ample redress. Byrne objected to the payment of the tax charged against him by the United States, and asked an abatement of it, which was refused by the department'at Washington.
I have not deemed it material to enquire what remedies the United States may have had to enforce the payment of taxess due to them, or whether they might have arrested the person of the debtor if he had not had sufficient property to satisfy their claim, as they certainly may in some cases, or at least in one case, as under the law, which was the subject of adjudication in the case in 18 Howard, before referred, to. These laws are extensive and complicated, and I have not examined them fully. Whatever they may be, they cannot affect the result in this case.
I have examined all the authorities referred to by the counsel for the defendant in error, at least all of them I could find in the State library, and do not think that any of them are in conflict with the views I have maintained; or if any of them are, I think they are outweighed by the authorities I have relied on in support of those views. I deem it unnecessary to notice in detail the eases cited in the argument. Scales v. Alvis, 12 Alab. R. 617, was much relied on by the counsel for the defendant in error, to show what strictness is required in the proceedings where land is made liable for the payment of taxes when the debtor has no personal estate. In Blackwell on tax titles, p. 177, the author says: “The strongest case upon this point is that of Scales v. Alvis;” andyetthereisnothinginthat case which is in conflict with the views I have expressed in this. The facts in that ease were,-that the delinquent had a yoke of oxen in the county, of value sufficient to satisfy the tax, but they were exempt by law from execution *209 for the debts of the owner. The court held the sale of the land void under these circumstances, the statute of Alabama providing that “where the delinquent has no goods and chattels within the county, then” his lands, &e., may he sold. The court, in their opinion, say: “ It will thus be seen that the power of the collector to sell lands is limited to those cases where the delinquent has no goods and chattels within the county. There is no provision for cases where the collector is unable to find, or the delinquent is unwilling to surrender, goods. The power exists only when there are no goods; and conforming to the principle of the many cases on this subject, we are constrained to decide that as .there was personal property of the delinquent within the county, the collector had no discretion to sell the land.” The court held that the statute exempting oxen from execution did not apply to taxes, and therefore that the oxen in this case were liable for the payment of the taxes due. There is a very important difference between the Alabama statute and our statute in this; that the former gives power to sell land only where there are no goods, while the latter gives power to arrest the person “ if the sheriff or collector shall he unable to find sufficient property to satisfy the taxes so assessed, and the same shall not be immediately paid.” But it does not appear in this case that the debtor had any goods when his person was arrested, much less that the sheriff was then able to find sufficient property to satisfy the taxes due. In the case of 18 Howard 286, before referred to, the court say that “the return of the marshal, that he had levied on the lands by virtue of the warrant, is at least prima fade evidence that his levy was not irregular by reason of the existence of goods and chattels of the collector, subject to his process.” So here, the arrest of the person of the delinquent is prima fade evidence that the sheriff could not find sufficient property to satisfy the taxes due at the time of the arrest, and *210 indeed lie expressly so declares in his return to the writ of habeas corpus, and there is not a particle of evidence to contradict the' return in this respect.
Upon the whole, I think the judgment of the court below is erroneous and ought to be reversed, and the defendant in error remanded to the custody of the sheriff of Henrico county.
The other judges concurred in the opinion of the President.
The judgment is as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that the said judgment of the Court of Hustings for the city of Richmond is erroneous. Therefore it is considered that the same he reversed and annulled, and that the plaintiff recover against the defendant her costs by her expended in the prosecution of her writ aforesaid here. And this court proceeding to enter such judgment as the said Hustings court ought to have entered, it is further considered that the said defendant he remanded to the custody of the sheriff and jailor of Henrico county, and that he pay the costs of the proceeding in the said Hustings court, and before the judge thereof; which is ordered to be certified to the said Hustings court. '