# Wytheville

## GALLIHER & HUGUELY, INCORPORATED v. E. S. FRAHER, ETC., ET ALS.

June 14, 1943.

Record No. 2667.

Present, All the Justices.

The opinion states the case.

B. *Hunter Barrow*, *William Earle White* and *Bowles, Anderson & Boyd*, for the appellant.

J. *Segar Gravatt* and *W. Moncure Gravatt*, for the appellees.

SPRATLEY, J., delivered the opinion of the court.

The appellees have moved to dismiss this appeal on the ground that the appeal bond furnished by the appellant is not such an instrument under seal as is required by Virginia Code, 1942, (Michie) section 6153.

This appeal was awarded on October 12, 1942. The attacked bond was given October 19, 1942. It bore a scroll instead of an impression seal as the seal of the corporate obligor. Notice of the motion to dismiss was given to the appellant on April 10, 1943, nearly six months later.

The motion is controlled by the rules and principles stated in *Harris* v. *Harrington*, 180 Va. 210, 22 S. E. (2d) 13. It is rejected because of the unreasonable delay in raising the objection.

The appellant asks that its contract for a purchase of timber be reformed and that it be allowed an abatement of

the purchase price because of a shortage in the timber, alleged to be due to a mutual mistake of fact as to the amount of the described acreage of the tract of land upon which the timber was located. No fraud is alleged or attempted to be proven. From a decree refusing relief this appeal was taken.

The evidence was heard *ore tenus* by the learned chancellor of the trial court. A condensation of the pertinent and material evidence supporting his conclusion discloses the following facts and circumstances:

In 1937, E. S. Fraher was requested by his mother-in-law and her relatives, owners of a tract of land in Greensville County, Virginia, known as the "Jas. D. Brown Property," to take charge of and sell the standing timber on their land. The owners of the land were not familiar with the boundary lines of the tract, which had descended to them from family sources over a long period of time. In order to establish these lines, Fraher employed the county surveyor, James C. Field. Field made a survey and plat with the courses and distances showing an acreage of 423 acres within indicated boundaries.

Fraher next employed an experienced timber cruiser or estimator to ascertain the quantity of timber on the tract. He then undertook to sell the timber to a number of prospective purchasers.

In 1938, Fraher called at the office of the appellant, and talked with its representative, T. W. Lipscomb, Jr., in an effort to sell the timber to the appellant for the sum of $20,000. Lipscomb stated that his company was not interested in its purchase at that price.

In March, 1939, he gave an option to J. H. Hardaway for thirty days on the timber at a price of $22,000. Hardaway tried to sell it to the appellant. In April, 1939, he took Lipscomb, an experienced timber estimator and operator, over the property and around its boundaries in an effort to sell the timber to the appellant. Lipscomb, after this inspection, again said his company was not interested in its

purchase at the price offered, and that he did not care to investigate it further; but would come back later if he changed his mind.

Two or three weeks later, when Hardaway's option was about to expire, Hardaway and Fraher again undertook, without avail, to make sale to the appellant through Lipscomb.

In July, 1939, Lipscomb called upon Fraher and asked if the timber had been sold and, if not, whether there had been any reduction in the price. He was told that the timber was still on the market and that it could be bought for the sum of $20,000. Very soon thereafter, Lipscomb and two other representatives of the appellant went with Fraher to view the timber. The boundaries of the tract containing the timber were pointed out to these representatives from a rough copy of Field's plat which Fraher had with him. Their inspection was interrupted by a rain before the entire property had been gone over. Lipscomb repeated that his firm did not care to purchase the timber at the price asked. Fraher, considering the matter closed, undertook then to interest other prospective purchasers.

On January 15, 1940, Lipscomb telephoned Fraher for an appointment. On the following day he went to Fraher's office at Blackstone, Virginia, and made an offer of $18,000 for the timber. Fraher refused the offer, replying that the price was $20,000 and no less. Lipscomb then said that he had been back on two other occasions with others and looked at the timber; that he did not think there was as much timber on it as Fraher thought; and that if it could not be bought for $18,000, he would need more time to consider the matter. Fraher stated that he was taking another person to view the property and if that person was interested, he would be given a period of thirty days in which to investigate, during which time the property would not be for sale otherwise. Lipscomb then said that he would purchase the timber for the appellant at the price of $20,000, upon condition that his company would have five

years in which to cut and remove it and be provided with a right of way for its removal.

With the approval of the owners, a memorandum of the terms of the contract was written out. Thereafter a deed of bargain and sale to the appellant was made and executed by all of the adult owners. The deed described the property sold as follows:

"All of the timber and timber trees of every kind and description standing and growing on the following described property, to-wit: All that certain tract or parcel of land lying, being and situate in Belfield District, Greensville County, Virginia, containing four hundred twenty-three (423) acres, more or less, as shown on plat of survey made by James Field dated April 13th, to 16th, 1937, described by metes as follows: Beginning at a dead oak tree, now down, at northeast corner, thence south 85 degrees west 1865 feet to stake in branch, thence south 28 degrees west 2092 feet to post oak, thence south 28 degrees west 400 feet to a pine tree along Virginian Railroad Right of Way, thence south 23 degrees west, 1390 feet to twin gum tree on mill branch. Down mill branch as it meanders 2975 feet to Broken Dam, thence down same branch 2000 feet to a maple tree near road, thence south 75½ degrees east 4140 feet to large pine tree, thence north 9½ degrees east 568 feet to stake, thence south 77½ degrees east 690 feet to pine tree, thence north 6 degrees east 600 feet, thence north 3½ degrees east 600 feet, thence north 13 degrees east 550 feet, thence north 1½ degrees west 800 feet, thence north 18 degrees east 287 feet, thence north 25½ degrees east 855 feet to center of railroad tract, thence north 25½ degrees east 2200 feet to point of beginning. It being the property devised under the will of James D. Brown recorded February, 1891, Will Book 9, page 615, to Lucy A. Brown, his widow, and his children, Emma Wright, M. Bessye Brown, and C. M. Brown."

The deed was prepared by the attorney for the appellant, B. Hunter Barrow, Esq. The description was furnished by the attorney for the appellees from Field's plat.

Barrow had been directed by the purchaser to examine the title to the property. He reported in his letter of title, dated January 22, 1940, that his examination disclosed the possible interest of some infants in the property and that it would be necessary to institute a chancery suit in order to clear its title and make a valid sale of the entire property.

Accordingly by agreement of the parties, a chancery suit was instituted for that purpose and it was therein determined that the three infant children of E. S. Fraher jointly owned a three-sixteenth interest in the land and timber, and that a sale of the timber to the appellant for the sum of $20,000 would be to the best interest of the infant defendants. A special commissioner was appointed on October 31, 1940, to convey the interest of the infants in the timber, located as described in the deed of the adult owners.

In the meantime, by agreement with the adult parties, the appellant began cutting and removing the timber, having deposited $6,667, one-third of the purchase price to the joint credit of the adult owners and B. Hunter Barrow, attorney for the appellant. The balance of $13,335 was to be paid upon completion of the suit and the delivery of a deed conveying the interests of the infants. The latter deed was delivered to Barrow on November 13, 1940, to be held in escrow pending the payment of the balance of the purchase money.

The title letter of Barrow to his client recited the history of the land from 1871 to date, showing a reduction in acreage of the original tract through various transactions, to an assessed acreage of 385¼ acres in 1888. It was dropped from the land books in the year 1903, and did not appear thereon again until 1938 and 1939, when it was shown as 385 acres. The title report concluded as follows:

"I urgently recommend and deem essential that a survey and plat be made of the property and lines definitely established. I am advised that there is a plat in existence showing the tract of land as 423 acres and this can be used to establish the present boundaries of the land and likewise ascertain the present acreage.

"I am unable to approve the title in its present form due to the facts hereinbefore set out.

"Of course, a proper chancery suit can be conducted and as a result thereof a good title to the property under examination can be acquired. It is doubtful if this can be accomplished in less than three months.

"In reference to the plat of survey heretofore mentioned, I am advised by Mr. Kelly Williams that he has seen a plat made by Mr: Field, Surveyor, in 1937 showing the tract of land as containing 423 acres, more or less. In any event I would have a representative for the company to go around the lines of the property to see that they are clearly chopped and defined. A copy of this plat should be recorded with the timber deed."

In December, 1940, after 85% or more of the timber had been cut, the appellant advised the appellees that, through a recent survey made by its surveyor, it had discovered a shortage of 76 acres in the tract, 18% of the total acreage, and requested an abatement of 18% of the agreed purchase price of the timber. The appellees refused to make any deduction, and the appellant declined to make any further payment. Thereupon the appellees promptly made the appellant a party defendant to the original suit for the sale of the infants' land, and prayed that it be required to comply with the terms of its purchase.

The appellant contends that it was misled by the representation that the tract, as shown on Field's plat, contained 423 acres of land, and that its estimate of the amount of timber was based upon that quantity of acreage. The appellees, on the other hand, maintain that the sale was in gross, that is, a sale of all of the timber upon their tract of land, whatever its measurement might be, and that the statement of acreage was descriptive and not material; that the appellant had full notice not only of what was intended to be sold, but of the possible shortage in the acreage; that the purchaser made its own estimate of the timber within the defined boundaries according to its own method of measure-

ment; and if there was any mistake, it was either a mistake in judgment or calculation on the part of the appellant.

Although the metes, courses, and distances on Field's plat appear to have been substantially correct, the tract did not contain 423 acres according to several other surveyor witnesses. These witnesses say it contained about 347.75 acres. The difference, they testified, might be attributed to errors by Field in plotting and calculation.

It also appears that there was a shortage in the amount of the timber estimated by the appellant to be on the tract, an estimate arrived at by treating all of the tract of 423 acres as being timber-bearing, except about 48 acres of open land.

It is important to note, however, that Field's plat does not show what amount was timber, open, or brush land, and there is no means of knowing in which character of land the error of Field as to acreage occurred or existed.

The appellant had full and ample notice of the boundaries of the land. Its representatives had gone over the land several times, and Lipscomb told Fraher before the deal was closed that he understood the acreage would not hold out. The letter of title from Barrow further served to put the appellant on notice of the necessity for a re-survey or covenant of acreage.

It seems clear from the evidence of Fraher that he only undertook to make a sale of the standing timber within defined boundaries. All of the negotiations were with reference to trees and timber and not land, and the only reference to the land was for the purpose of description. The sellers were concerned with the matter of price, not with measurement. Neither the plat of Field, the memorandum of sale, nor the deed makes mention of the specific number of acres carrying the timber. Both parties knew that there was some open land.

The sellers sold and delivered all that they intended to sell, which was the timber on the James D. Brown tract of land. They did not sell this timber by measurement nor did they warrant or covenant the quantity of timbered land.

The estimated measurement of the timber was not that of the sellers but of the buyer. It made its own measurements without informing the sellers of its estimates. It acted upon its own judgment and the judgment of its representatives. It does not show any loss or damage on the purchase price.

Acreage is not necessarily a material or essential fact in the sale of timber. The value of timber on a tract of land is controlled by many varying facts, such as the number of trees, their kind, character, grade, size, and their availability to manufacturing and transportation facilities. The methods of measuring and estimating timber are numerous, all of which appears to be subject to some fluctuation and certain hazards. The appellant chose its own method, with full opportunity to make a more accurate estimate.

The appellees having sold the timber regardless of acreage, there was no mutual mistake between the parties. They cannot be placed *in statu quo* by reforming the contract. They have been guilty of no fraud. A court of equity will not enforce upon them a contract which they did not intend to make.

In Virginia, we have adopted the general rule that where the language of a contract for the sale of real estate does not plainly indicate that the sale was intended to be in gross, it is presumed to be a sale per acre. *Boschen's Ex'x* v. *Jurgens' Ex'r*, 92 Va. 756, 24 S. E. 390; 9 Michie's Digest of Va. & W. Va. Reports, Vendor and Purchaser, page 868, and cases cited. But we have refused to make this rule applicable to sales and conveyances of timber. *Shoemaker* v. *Cake*, 83 Va. 1, 1 S. E. 387; *Elam* v. *Ford*, 145 Va. 536, 134 S. E. 670.

While the facts in the cases of *Shoemaker* v. *Cake, supra*, and *Elam* v. *Ford, supra*, are not in all respects identical with those of the case at bar, they are in many respects so similar that the principles of law applied in those two cases are equally applicable here.

In the first mentioned case, a purchaser bought the timber on a tract of land advertised to contain 300 to 400 acres of timber. Afterwards it was discovered that the land from

which the timber was cut did not contain 400 acres, but only 218 acres, and an abatement of the purchase price was requested. The vendors insisted that they had not sold any designated quantity of land, but the timber upon a certain tract within designated boundaries, which were personally shown to the purchaser.

This court, after referring to the principles which govern the measure of compensation in case of mistake as to the quantity in the sale of lands, when the parties contract for the payment of a gross sum for a tract of land upon an estimation of a given quantity, which influences the price to be paid, said: "But these principles have no application to a case like this. There is no sale of any quantity of land. The sale is of a lot of timber. There is no estimate of the quantity,—all the timber within certain boundaries is sold."

In the second case, *Elam* v. *Ford, supra,* there was a sale of timber described in a written contract as "all the merchantable timber from twelve inches in diameter and up located on the south side of Thorofare Ridge, known as the James Elam and John Riner tract of land, containing by estimation 200 acres." The boundary of the timber was shown in a general view to the purchaser and he had estimators go upon the property before his purchase. A survey after the sale showed that there were only 90.65 acres of timber. An abatement of the purchase price was refused on the ground that it was apparent that the timber was sold by the boundary and not by the acre, and the contract for its sale was a contract of hazard against which equity would not grant relief in the absence of fraud on the part of the vendor. There, after affirming the general rules applicable to the sale and conveyance of land, whether in gross or by the acre, Judge West, reviewing the cases, said: "While these principles have been applied frequently by this court in cases where there was a mistake as to quantity in the sale of land, and the acreage influenced the price at which the land was purchased, we can find no case, and none has been cited, in which they have been applied to a sale of standing timber."

See also. *Stump* v. *Hite,* 86 W. Va. 233, 102 S. E. 926.

The appellant relies upon *Briggs* v. *Watkins*, 112 Va. 14, 70 S. E. 551. That case may be distinguished upon the facts. There the vendors had undertaken to sell, and the vendees had estimated, the timber on a tract of land which did not belong to the vendors. The contract was based upon a mutual mistake as to the location, ownership, and identity of the tract of land upon which the timber stood.

In the case before us, the appellant investigated and estimated the very timber upon the identical tract of land which contained the timber. There was no mistake as to the identity of the timber or the land.

There was ample, credible evidence to support the conclusion of the trial court that here, the sale was a sale of timber within designated boundaries without warranty or covenant as to the number of acres upon which the trees stood, without guaranty as to the quantity, and consequently a sale in gross under a contract of hazard. *Planters Nat. Bank* v. *Heflin Co.*, 166 Va. 166, 184 S. E. 216.

We find no error in the legal principles applied. The decree appealed from is affirmed.

*Affirmed.*