## Staunton.

J. C. LOGWOOD, JR., ET AL., V. W. B. HOLLAND.

September 22, 1921.

Absent, Burks, J.

1. VENDOR AND PURCHASER—*Rescission—Election to Rescind or Ask for Abatement of Price.*—A bill by the purchaser of an orchard against the vendor alleged misrepresentation as to the number of trees in the orchard. It also alleged that neither at the time the purchaser discovered the shortage nor at any other time before bringing suit did he offer to return the property, or intimate any desire to do so. So far as the bill indicates, the purchaser made no suggestion for any settlement except a rebate on the purchase price.

   *Held:* That the bill did not state a proper case for rescission, but that the purchaser must be regarded as having elected to retain the property, and waive his right to have a rescission of the contract.

2. REAL PROPERTY—*Growing Trees.*—Growing trees are a part of the realty, and a sale thereof is a sale of an interest in land.

3. VENDOR AND PURCHASER—*Purchaser's Remedy in Equity—Loss of Any Part of Realty Affecting Purchase Price.*—While bills in equity seeking a purely pecuniary recovery on account of mutual mistake (or mistake of one party caused by fraud or culpable negligence of the other) have probably heretofore in Virginia been confined to cases involving a shortage of acreage, or loss of part of the acreage contracted for by title paramount, there is no reason why the principle as to shortage of acreage should not be extended in a proper case to mistakes resulting in loss of any part of the realty which affected the purchase price.

4. VENDOR AND PURCHASER.—*Purchaser's Remedy in Equity—Loss of Any Part of Realty Affecting Purchase Price—Case at Bar.*—In the instant case, the sale of an apple orchard, the number of trees contained in the orchard was misrepresented to the purchaser by the vendor's agent.

   *Held:* That as the mistake in the number of trees should be governed by the principles governing a mistake in acreage, there could be no question as to the jurisdiction in equity to afford

relief by an abatement of the purchase money, or, where all the money has been paid, by a money recovery for the deficiency.

5. Vendor and Purchaser—*Mutual Mistake—Mistake Occasioned by Fraud or Negligence of One Party—Case at Bar.*—The agent of the vendor of an apple orchard represented the orchard as containing about 500 bearing trees. As a matter of fact, the orchard contained less than 350 bearing trees. In a suit in equity against vendor by vendee, the bill charged that these representations were false and fraudulent.

*Held:* That the representations were certainly false, and, whether designedly so or not was immaterial, because if vendor's agent did not know them to be false, there was a mutual mistake; if he knew, or ought to have known, that they were false, then there was a mistake on one side occasioned by fraud, or culpable negligence on the other.

6 Vendor and Purchaser—*Suit for Abatement of Purchase Price—Parties—Vendor's Agent.*—Agent of vendor was properly made a defendant in a suit by vendee for abatement of the purchase price on the ground of fraudulent representations as to the subject matter of the sale, where the bill showed that the agent was primarily responsible for the alleged fraud, and fraud on its part was distinctly charged. It also appeared that the agent, while not the owner of the property, had a direct interest in it.

7. Vendor and Purchaser—*Deficiency in Acreage—Measure of Damages.*—In cases of deficiency in acreage in sales of land, unless there be special considerations requiring a departure from the rule, the compensation is to be fixed by multiplying the number of acres lost by the average price per acre. If there be exceptional circumstances, such, for example, as the existence of valuable buildings, springs, or bridges and fisheries, on the land involved, then the relative value of such things is to be fixed with reference to the contract price for the whole estate, and compensation therefor determined accordingly.

8. Vendor and Purchaser—*Deficiency in Acreage—Measure of Damages—Case at Bar.*—In the instant case, suit by the vendee of an apple orchard for a shortage in the number of trees which the orchard was represented to contain, the value of the trees lost to the purchaser by such misrepresentation must be determined with reference to the price agreed upon for the whole estate, and a substantial variation from this rule would constitute error. However, it was fairly deducible from the record that in the case at bar there was no substantial departure from this rule.

9. Reference—*Exception to Report—No Objection at Hearing.*—In a

suit by the purchaser of an apple orchard for a shortage of trees, the evidence introduced on behalf of the complainant to establish the damage was not objected to on the ground that complainant was following the wrong measure of damage until after the commissioner had made his finding, and no evidence at all was introduced before the commissioner on the part of the defendant to rebut the evidence thus introduced by the complainant, or to fix the damage by any different rule. *Held:* That, under these circumstances, the exception to the report on the ground that the wrong measure of damage was used was properly overruled.

Appealed from a decree of the Circuit Court of Bedford county. Decree for complainant. Defendants appeal.

*Affirmed.*

The opinion states the case.

*O. C. Rucker, Jas. D. Johnston* and *Jackson & Jackson,* for the appellants.

*Nelson Sale,* for the appellees.

KELLY, P., delivered the opinion of the court.

On January 1, 1916, John C. Logwood, Jr., through the agency of the Virginia Land Immigration Bureau, sold and conveyed to W. B. Holland an orchard property in Bedford county containing about twenty-five acres. The consideration for this sale and conveyance was $3,000.00 paid and to be paid as follows: $500.00 cash, $500.00 September 15, 1916, $1,000.00 January 1, 1917, and $1,000.00 January 1, 1918, the deferred payments being represented by Holland's negotiable notes and secured by deed of trust on the property. All of these notes were subsequently paid.

In August, 1917, Holland filed his bill in equity against Logwood and the Virginia Land Immigration Bureau, in which he alleged that he had been misled as to the number

of apple trees on the land, and prayed that the court would either set aside the contract of sale and order a refund of the purchase price and the expenses incurred by him in connection therewith, or require the defendants to pay him the sum of $1,050.00, the alleged difference between the value of said property as represented to him and its value as shown by an actual count of the trees.

The defendants demurred to and answered the bill, proof was taken on both sides, and the court on April 8, 1918, entered a decree which (1) overruled the demurrer, (2) refused a rescission of the contract and (3) held that the complainant was entitled to an abatement of the purchase price in an amount equal to the value of the trees which were represented to be, but turned out not to be upon the land, and directed one of the commissioners of the court to ascertain and report such value, the report to be based on the evidence already adduced in the cause, as well as any other evidence offered by the parties which the commissioner might deem necessary and pertinent.

The commissioner, after taking further proof, reported that the value of the short or missing trees was one thousand dollars. The Virginia Land Immigration Bureau excepted to the report on several grounds, the one chiefly relied upon being that the commissioner had proceeded on the wrong theory as to the measure of damages; and the court on May 10, 1919, entered a decree reducing the sum fixed by the commissioner to $925.00 and awarding the complainant a recovery against both defendants for that amount, with interest from the date of the conveyance.

This appeal calls in question the correctness of the two decrees above recited, and the first assignment of error brings under review the action of the court in overruling the demurrers.

The allegations of the bill, which of course must be regarded as true upon the demurrers, make out a case which in narrative form may be stated as follows:

In the fall of 1915 Holland saw an advertisement of the Virginia Land Immigration Bureau which was as follows:

"Peaks of Otter Orchards"

$10,000                    25 Acres                    No. 1047
Bedford Co., Va.          7 mi. Ry.          Terms satisfactory.

"Located on Peaks of Otter road, near Peaksville, R. F. D. route, one mile of church, store and near mill; black Porter's loan soil with black subsoil, watered by branch and spring hardwood timber land, considerable oak and chestnut; land lies gently rolling with a slope to the southeast, sixteen acres cleared and in orchard, balance in second growth timber.

"Orchard consists of sixteen acres, one of the finest old orchards in the State with 500 bearing trees, thirty-five years old, nearly all Albemarle Pippins, probably 100 Cannon Pearmains; in addition, there are 200 Albemarle Pippins two years old; plenty of pears, cherries, plums, grapes, all bearing and of the best variety.

"Improvements consist of a double dwelling of five rooms and apple house with cellar, barn and implement house. Improvements are not in the best condition. Fences sufficient for the place and satisfactory for the turning of sheep.

"The most magnificent mountain stream passes through the property. This property is one of the most desirable in the State and the most productive. It has produced $3,000 worth of apples in one year. It is located right near the Peaks of Otter and between two peaks. The scenery is splendid, and there can be no more attractive or desirable orchard location, and the orchard itself has been pruned, sprayed and kept in good order, always having been scientifically handled. The prospects are sufficient to believe that 1912 stock will give returns to pay half the price of the place."

Holland, who had been contemplating buying an orchard for some time, was attracted by the terms of the foregoing advertisement and decided to look into it. He was a city man residing in New York, had no practical experience or knowledge in respect to orchards and like property, and relied entirely upon what was stated in the advertisement and upon what he was subsequently told with reference to the property.

On November 17, 1915, Holland visited the office of the Virginia Land Immigration Bureau in Roanoke, Va., discussed the property with that concern, was informed that it might be bought for as little as $3,000.00, and then came to Bedford county with one Mr. Kinsey, a representative of the bureau, to visit the orchard. There he met Logwood, the owner, with whom he discussed the property, but who made no direct or important statements or representations to him. Holland remained at the orchard on that occasion for about half an hour looking over it in a somewhat casual manner, but made no attempt to count the trees.

After making this inspection Holland returned to his home in New York, and on December 11, 1915, by appointment and in company with Dr. W. J. Quick, general manager, and George D. Wingfield, local agent of the bureau, he made a second visit to the property. At that time Dr. Quick stated to Holland that he was a practical, scientific orchardist; that the orchard was a very fine one; that in one year $3,000.00 worth of apples were sold from it; that he counted the trees with one Mr. Cummins, who had bought the orchard about three years prior thereto, and that there were then about 495 old bearing trees; that possibly a few had died or been blown down since that time, and that he believed that it would be safe to say that there were at the time they were talking not over 490 or 495 trees, but that 200 young trees had been planted. On the next day Holland visited the orchard again, but the weather was

very cold and disagreeable, the ground was covered with snow, and Hollond did not attempt to make any count of the trees, and did not consider a count necessary because of the above recited representations made to him by Dr. Quick. He returned to New York, and on December 17, 1915, wired Dr. Quick that he would take the property at the price and on the terms mentioned in the conveyance of January 1, 1916, hereinbefore set out.

Holland did not visit the orchard after his purchase until June, 1916, and did not make a very full inspection at that time because of weather conditions; but he had placed a man named Clark on the property to care for it, and was informed by him some time in July, 1916, that there were only 320 bearing trees on the place. It does not appear that he made any complaint about this fact until September, 1916, when he saw Dr. Quick and "mentioned this shortage to him and asked if he did not think that he (Holland) should have a rebate, to which Quick replied: 'You certainly should have if the count is short as you say, but I cannot believe that they can be that short'."

During the next two or three months Holland mentioned to Dr. Quick on several occasions the shortage in the trees in an effort to get some settlement on that account, and Dr. Quick led him to believe "that something could be done in the matter, but that it would have to be passed on by the board of directors of the Virginia Land Immigration Bureau," and Holland was "put off in that way from time to time;" and "this proposition for a settlement or rebate on account of this shortage continued on through the fall of 1916, until January 2, 1917." In the meantime the purchase money note for $500.00 due in September, 1916, was paid by Holland "under the impression and belief that the shortage in trees would be made good to him."

On January 2, 1917, Holland and the said George D. Wingfield, at the former's request for an accurate count of

the trees, made such a count and found that there were only 332 old bearing trees, and this fact was reported to Dr. Quick, who stated that the matter would be taken up with the board of directors the next day. After that meeting Quick wrote Holland that "the board of directors declined to make any settlement."

It is further alleged that when the purchase money note due January 1, 1917, became due, and in order to avoid a sale of the property under the deed of trust, it became necessary to pay not only that note but all of the remaining purchase money, whether at that time due or not.

The bill further alleges that by reason of the false advertisement, representations and inducements on the part of the Virginia Land Immigration Bureau, Holland was grossly and fraudulently deceived concerning the property and the number of trees thereon, and thus persuaded to give much more for the property than he would otherwise have given and much more than its true value, and was thereby defrauded and cheated out of $1,050.00.

The prayer of the bill, after naming the Virginia Land Immigration Bureau and John C. Logwood, Jr., as defendants, and calling upon them to answer, but waiving answer under oath, was as follows:

"May the said contract of sale as above set forth as having been induced by false and fraudulent representations be set aside, declared null and void, and your complainant be refunded the sum of $1,000.00 expended by him in and about said purchase, and your complainant's purchase money of $3,000.00 be returned to him; or if said sale is confirmed, may the defendants be required to pay to your complainant the sum of $1,050.00, the difference between the value of said property as shown and estimated by said advertisement and the true value of said property by an actual count of the trees upon the same; may all proper accounts be ordered and taken; and all such other and general relief

13

be granted to your plaintiff as to equity seems fit and good conscience may require."

The chief ground relied upon in support of the demurrer is that the bill shows on its face that it was not good as a bill for rescission, and asserts a purely legal demand for damages cognizable only in a court of law.

We think it reasonably clear that the bill does not state a proper case for rescission. It alleges that after the complainant was apprised in July, 1916, by his own representative and caretaker, Clark, as to the shortage in the number of old trees, he neither at that time nor at any other time before the bringing of this suit offered to return the property, or even intimated any desire to do so. Upon the contrary, he made no request or suggestion, so far as the bill indicates, for any settlement or redress except a rebate on the purchase price. Under these circumstances he must be regarded as having elected to retain the property, and to have thereby waived his right to have a rescission of the contract. *Hurt* v. *Miller*, 95 Va. 32, 41, 27 S. E. 831.

[2-3] But it does not follow from this conclusion that the demurrer was improperly overruled. The bill states facts entitling the complainant to relief in another view of the case. It is well settled in this State that growing trees are a part of the realty and that a sale thereof is a sale of an interest in land. *Stuart* v. *Pennis*, 91 Va. 688, 690, 22 S. E. 509. It is probably true, as contended by counsel for appellants, that bills in equity seeking a purely pecuniary recovery on account of mutual mistake (or mistake of one party caused by fraud or culpable negligence of the other) have heretofore in this State been confined to cases involving a shortage of acreage, or loss of part of the acreage contracted for by title paramount. Some of the cases, however, have expressly recognized the propriety of considering improvements or other items of special value in fixing the abatement, and we are unable to see any reason why this principle so sound

and just in itself, and so well established as to shortage of acreage, should not be extended in a proper case to mistakes resulting in loss of any part of the realty which affected the purchase price. The underlying reason for allowing an abatement when there has been a loss of acreage is that the estimated amount influenced the price. *Blessing* v. *Beatty*, 1 Rob. (40 Va.) 304; *Watson* v. *Hoy*, 28 Gratt. (69 Va.) 698, 705. The allegations in the bill show that the sale in this case was made upon an understanding that there were a certain number of trees on the land, and independent of the *prima facie* presumption that in the sale of an orchard the number of trees influences the price, the bill further affirmatively shows that this was in fact true, and to a very material degree.

[4] If we were warranted in treating the mistake as to the number of trees being controlled by the principles governing a mistake in acreage—and we cannot doubt that we are—then there can be no question as to the jurisdiction in equity to afford relief by an abatement of the purchase money, or, as in this case where all the money had been paid, by a money recovery for the deficiency. The equitable jurisdiction in such cases is perfectly well settled and is not questioned here. *Blessing* v. *Beatty, supra; Boschen* v. *Jurgens,* 92 Va. 756, 24 S. E. 390; *Hull* v. *Watts,* 95 Va. 10, 27 S. E. 829.

[5] The ground of the jurisdiction as clearly stated in the cases cited is that of mistake, "whether the mutual mistake of the parties, or the mistake of one of them occasioned by the fraud or culpable negligence of the other." This ground plainly exists here. The Virginia Land Immigration Bureau by its advertisement, and by the subsequent representations of Dr. Quick relied upon by the complainant, led the latter to believe that there were approximately 500 bearing trees on the land, the greater part of which the evidence clearly shows were understood by Holland to

be Albemarle Pippins, when as a matter of fact there were 168 trees less than that number, and only 126 Albemarle Pippins. The bill charges that these representations were false and fraudulent. They were certainly false; whether designedly so or not is immaterial. If Dr. Quick did not know them to be false, there was a mutual mistake; if he knew, or ought to have known, that they were false, then there was a mistake on one side occasioned by fraud or culpable negligence on the other.

[6] It is insisted that in any event the bill should have been dismissed as to the Virginia Land Immigration Bureau because it was a party neither to the contract nor the deed, but was simply an agent for the grantor. This position is not tenable. The bill shows that the agent was primarily responsible for the alleged fraud, and fraud on its part is distinctly charged. It was, therefore, clearly proper to join the bureau as defendant. 31 Cyc. 1624. And we may add in this connection that when the proof was taken it appeared that the Virginia Land Immigration Bureau, while not the owner of the property, had a direct interest in it and was to receive all of the proceeds of the sale over and above twenty-one hundred dollars.

The proof sustains the material allegations of the bill. We do not understand it to be seriously contended that upon the facts the complainant is not entitled to proper compensation for the loss of the trees both against the principal, Logwood, and his agent, and if there were any such contention we would have no difficulty in rejecting it. The only questions in this case are as to the form of procedure and the measure of relief.

We come now to the only other assignment of error requiring attention, and under this assignment it is claimed that if the defendants were liable to the plaintiff, "the value of 168 trees without reference either to the purchase price paid for the property or the value of the property actually

received by the plaintiff is not the true measure of the plaintiff's damages."

We have held that this case is controlled by the same principles as if part of the acreage instead of part of the trees had been short; and the measure of recovery must be fixed accordingly.

The evidence shows that the false representations affected the substance of the thing contracted for, and the purchaser, therefore, originally had two remedies—he could restore the property and have a rescission of the contract, or he could keep the property and have compensation for the loss. He has by his conduct elected to adopt the latter remedy. What then is to be the measure of his compensation?

[7] In cases of deficiency in acreage, unless there be special considerations requiring a departure from the rule, the compensation is to be fixed by multiplying the number of acres by the average price per acre. *Blessing* v. *Beatty, supra; Watson* v. *Hoy, supra.* If there be exceptional circumstances, such, for example, as the existence of valuable buildings, springs, or bridges and fisheries, on the land involved, then the relative value of such things is to be fixed with reference to the contract price for the whole estate, and compensation therefor determined accordingly.

In *Hoback* v. *Kilgores,* 26 Gratt. (67 Va.) 442, 21 Am. Rep. 317 (a suit for a specific performance), there was a shortage of acreage, but there were upon a portion of the land acquired by the vendee improvements consisting of a dwelling house, outhouses, a tanyard and a gristmill, the value of which had evidently influenced the purchase price. This court, in an opinion by Judge Moncure, while recognizing the general rule as laid down in *Blessing* v. *Beatty* that in cases of mere deficiency in quantity, compensation is to be awarded according to the acreage value of the land, held that the improvements above mentioned required a departure from the general rule, and said:

"In this case the just and true measure of compensation is according to the average value of the land without the improvements considering both together to be worth the contract price of fourteen hundred dollars, estimating the quantity of the land, as the parties did, at one hundred and twenty-seven and a half acres."

In *Watson* v. *Hoy*, 28 Gratt. (69 Va.) 698, 713 (a judicial sale in which the purchaser after confirmation was allowed an abatement of the purchase price for a deficiency of acreage), the court, in an opinion by Judge E. C. Burks, after calling attention to the fact that there were on the land actually acquired by the purchaser certain valuable buildings, bridge privileges and fisheries, which must have entered largely into the agreed price for the entire estate, held that in fixing the amount of the abatement the relative value of these improvements should be deducted from the entire purchase price for the whole estate, and the sum remaining should be used in determining the average price per acre.

In *Yost* v. *Mallicotte*, 77 Va. 610 (a suit for an abatement of price on account of deficiency in the acreage), this court, in an opinion by Judge Lacy, applied the general rule of the average price per acre, and reversed the lower court which had fixed the compensation for the deficiency by first ascertaining and deducting from the price of the whole the value of the improvements, the latter court having apparently followed *Hoback* v. *Kilgores, supra,* and *Watson* v. *Hoy, supra.* Upon the facts it is difficult to reconcile the court's refusal to give any consideration to the valuable improvements in *Yost* v. *Mallicotte* with the rule of decision as settled in the other two cases last above cited, but the rune itself was not in any way changed by the *Yost Case,* because that case expressly recognized the rule as laid down in the other two cases and disregarded the improvements because, as the opinion held, they were not of sufficient importance to constitute an exception to the rule.

In the case of *Grayson* v. *Buchanan*, 88 Va. 251, 13 S. E. 457, the vendor had represented the tract to contain 140 acres when it contained only 126 acres, and it also represented that half of a certain spring was situated on the tract, when as a matter of fact no part of the spring was so situated. The purchaser was sued for the purchase price, and the defendant offered an equitable plea seeking an abatement for the false representations as to the acreage and as to the spring. In an opinion by Judge Lewis this court held that as to the acreage the usual rule based upon the average price per acre applied and abated the price as to the acreage accordingly; but as to the loss of the spring the abatement was fixed by taking the total price of the property and determining how much less than the whole price the land would be worth by reason of the loss of the spring.

The rule as gathered from the foregoing cases seems to be that when improvements or other features of peculiar value form a part of the realty sold, the value in fixing compensation for a deficiency in the substance of the thing sold is to be based upon the agreed price for the whole estate, and this rule seems to us to be entirely in accord with reason and justice.

[8-9] In the instant case it follows that the value of the trees lost must be determined with reference to the price agreed upon for the whole estate, and a substantial variation from this rule would constitute error. It is fairly deducible from the record, however, that there has been in fact no substantial departure from this rule.

The decree of reference found as a matter of fact that the complainant (who was shown to have bought for a total price of $3,000.00) made his calculation to buy and was induced to buy on the belief that there were 500 bearing trees (the greater part of which were represented as Albemarle Pippins), when in fact only 332 bearing trees were on the land, and of these only 126 were Albemarle Pippins.

With these facts before the court it ordered the commissioner to report "the value of the 168 trees." The clear meaning of the court was that the commissioner was to determine the relative value of the trees which were short. More than this, the two witnesses whose evidence was relied upon chiefly in fixing the value, made their examination of the property at the request of counsel for the complainant, who had informed them in writing that he had paid $3,000.00 for the land, that the orchard contained twenty-five acres, and that trees of certain varieties and in certain numbers had been represented as being on the land, and asked them to ascertain the proportionate loss. And it is manifest that these two witnesses, as well as practically all of the witnesses who testified upon this point, did so with the original cost price in view, and that upon the evidence as a whole the court could not reasonably have fixed the damages at less than $925.00 even if the rule contended for by counsel for the defendant had been specifically laid down in the decree and followed by the commissioner and the court. The evidence which was introduced on behalf of the complainant to establish the damage does not appear to have been objected to on the ground that the complainant was following the wrong measure of damage until after the commissioner had made his finding, and no evidence at all was introduced before the commissioner on the part of the defendant to rebut the evidence thus introduced by the complainant, or to fix the damage by any different rule. Under these circumstances the exception was properly overruled. See *Jeffries* v. *Virginia Railway & Power Co.*, 127 Va. 694, 732, 104 S. E. 393, 405, and cases cited.

It is insisted that the commissioner's allowance of $1,000 for 168 trees means that if the whole 500 trees had been lost, the damage would have been equal to the entire purchase price of the land, and the purchaser would have received the land and the young trees free. This contention

is not sound. It must be remembered that the value of the land itself was very small. The property was valuable chiefly as an orchard, and the evidence clearly shows that the 168 trees must have been regarded as worth relatively more than the average value of all the trees contracted for. Neither the commissioner nor the court attempted to follow the exact figures or the precise method of calculation adopted by the witness. The commissioner reported that it was "impossible to figure the exact valuation of these trees, in view of the differences of opinion expressed by the witnesses," that after carefully considering all the evidence he was of the opinion that the value of the 168 trees which were short could safely be placed at about $1,000, and that he accordingly reported that sum as the proper amount to allow complainant as damages for the loss sustained. The court, "having fully read and considered all the evidence upon which the report of the master commissioner was based, being of opinion from the evidence that the amount of damages to which the plaintiff is entitled, whether based upon the relative value of the shortage in the number of trees, to the purchase price or based upon the difference between the actual value of the land and trees upon the day of sale and the total amount paid by the plaintiff for said property, is $925," sustained the exception to the report to the amount of $75.00 and awarded a recovery against both defendants for the former sum.

There is no error in the decree to the prejudice of the appellants, and it must be affirmed.

*Affirmed.*