# CIRCUIT COURT OF NORTHUMBERLAND COUNTY

Bruce Mazza Langmaid

v.

Richard Bland Lee, V

January 9, 2013

Case No. CL08-133

By Judge Harry T. Taliaferro, III

In this suit, the plaintiff Bruce Mazza Langmaid asserts he properly terminated his Contract to Purchase improved real property from the defendant Richard Bland Lee, V, and seeks recovery of the Contract escrow deposit and other related relief. This letter rules on Lee's Demurrer to Langmaid's claims of breach of contract, misrepresentation (fraud), negligent misrepresentation (constructive fraud), and injunction in Counts One through Four of the five count Complaint.

*Fact Allegations in Complaint*

Lee as seller and Langmaid as buyer entered into a VAR Form 600 Residential Contract of Purchase dated September 27, 2007, with several Addenda for the sale of land and improvements located in Northumberland County described as "containing 6.91 acres, more or less, fronting on Dividing Creek, further described in Deed Book 603, page 170, and more commonly known as: 582 Cobbs Hall Lane, Kilmarnock, VA 22482." The parties acknowledge that while the Deed Book and page reference in the

description is erroneous, the deed to the defendant with plat attached is properly recorded elsewhere in the Clerk's Office of this Court. (Comp. ¶¶ 28, 29, 30, 31, 32, 33, 36, 37, & Exh. 1.) The Contract purchase price was $1,150,000 payable at settlement. (Exh. 1.)

During contract negotiations, seller's agent Frank Hardy, Inc. ("FHI" or "Lee's agent") provided Langmaid with a copy of the April 1992 Tomlin & Keyser survey recorded with Lee's acquisition deed which described the property as shown by such plat. (Comp. ¶¶ 23, 24, 25, 26, & 27.) During such negotiations, FHI and/or seller's daughter Victoria Adams ("Ms. Adams") gave Langmaid the Keyser survey as representing the boundaries and size and features of the "Cobbs Hall" property. (Comp. ¶¶ 27 & 37.) Lee's daughter is also alleged to be his agent. She is distinguished in this letter, however, because she is not alleged to be a real estate broker or agent under Title 54.1. The Keyser survey showed the property to contain 6.91 plus acres and to have 958 more or less feet of waterfront, as it was also advertised on the Multiple Listing Service ("MLS"), and a white sand beach. (Comp. ¶¶ 11, 25, 26, & 27.) In walking the property during negotiations, in response to his inquiries, Langmaid was told by Lee's agent and/or Ms. Adams that the white sand beach conveyed and that the pile of materials Langmaid saw on the property was Lee's disassembled pier. (Comp. ¶¶ 18, 19, 20, 21, & 22.)

After entering into the Contract, Langmaid, pursuant to its terms, had a professional home inspection performed for which, by Addendum, he received a credit of $102,727.00 against the purchase price and the parties agreed to remove all contingencies other than termite and well and septic. (Comp. ¶¶ 43, 44, & Exh. 1.) Based on his own observation and inspection of the well, Langmaid noted the pump running continuously and the holding tank to be empty and raised concerns with Mr. Lee and/or his agent that the well needed remedy or repair. (Comp. ¶¶ 45, 46, 47, 48, 49, & 50.)

In a discussion after the Contract was signed, Lee informed Langmaid for the first time that, before putting the property on the market, Lee had a dispute with an adjoining landowner named Benhoff concerning their common property line and a pier Lee had built out into Dividing Creek, as the result of which Lee acquiesced in the dismantling of his own pier. (Comp. ¶¶ 12, 13, 14, 15, 16, 17, & 51.) In the same discussion, Lee informed Langmaid that the sand beach conveyed and that Benhoff had moved or removed a property line marker. (Comp. ¶¶ 52, 53, & 54.) Upon hearing these things, Langmaid had Charles Pruett survey the property. (Comp. ¶ 55.) Pruett's survey dated February 20, 2008, compared to the Keyser survey, showed 6.66 acres, 100 feet less water frontage and the sand beach to be on the Benhoff property. (Comp. ¶ 56.) On March 10, 2008, the day before settlement, Langmaid gave notice in writing to his and Lee's agents that he was terminating the Contract because, due to water supply issues, the sand beach not conveying, and the property line dispute Lee had

breached the Contract; Langmaid also demanded the return of his $100,000 contract escrow deposit and a release signed by Lee. (Comp. ¶¶ 38, 39, 40, & 58.)

## Standards on Demurrer

Upon consideration of a Demurrer, the Court accepts all material facts alleged in or reasonably inferable from the plaintiff's pleadings to be true. The Court does not evaluate and decide the merits of the claim, it only tests the sufficiency of factual allegations to determine whether the plaintiff's pleadings state a cause of action. *West Virginia Properties, Inc. v. First Va. Mtg. & Real Estate Inv. Trust*, 221 Va. 134, 267 S.E.2d 149 (1980); *Board of Supvrs. v. Southland Corp.*, 224 Va. 514, 297 S.E.2d 718 (1982). A court may examine not only the substantive allegations attacked, but also any accompanying exhibit mentioned in the pleadings. *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22 (1993). See also VSC Rule 1:4(i). The Court may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings. *Ward's Equipment v. New Holland North Am.*, 254 Va. 379 (1997). Allegations stating conclusions of law or inferences drawn from conclusions of law are not taken as admitted by a demurrer. *Motors Ins. Co. v. United States Fire Ins. Co.*, 208 Va. 684 (1968).

## Analysis of Demurrer to Count One: Breach of Contract

Count One alleges Lee breached the Contract because (a) he failed to fix the water supply issue; (b) he was incapable of conveying the property Langmaid contracted to buy; (c) the property line dispute is a title defect; and (d) Lee failed to sign a release allowing the escrow deposit to be returned. Langmaid has withdrawn claims based on an incorrect deed book and page reference in the Contract property description. The book and page were meant to properly reference the place of recordation of the Keyser plat.

Lee demurs to each of the claims of breach of contract. In determining whether a cause of action has been stated for breach of contract, the Court considers in each instance the specific allegations in the Complaint and the language in the Contract itself which is a part of the pleadings.

### A. *Failure To Fix the Well*

Lee argues that, because Langmaid elected a professional home inspection (see Contract ¶¶ 17 & 14) and received under the Addendum agreement a $102,727.00 credit "in lieu of all repairs to the property at settlement" except for contract contingencies for "termites and well and septic," Lee was only obligated to provide Langmaid with certificates, dated not more than thirty days prior to settlement, that the well water is free

from contamination by coliform bacteria, and that there is no malfunction of or needed maintenance to the septic system. (See Contract ¶ 15.) Since Langmaid does not allege the failure to provide such certificates, Lee asserts he has failed to state a cause of action for breach of the Contract.

Langmaid contends that, although the Addendum removed all other repair contingencies, well and septic repair provisions in the Contract did survive. Langmaid argues that the language in ¶ 15 requires Lee to perform needed maintenance to the well that Langmaid found as the result of his own inspection on an unspecified date before closing and about which he "raised concerns" with Lee or his agents. Lee counters that the "needed maintenance" language in ¶ 15 applies only to the septic system, not the well.

The language in ¶ 15 reasonably implies that the well must be pumping water during the thirty days before settlement for the purposes of getting a test water sample and ascertaining proper functioning of the septic system. The question of operational condition of equipment (including the well) at settlement, where the seller has had a professional home inspection, is specifically addressed in subpart (b) of ¶ 14 of the Contract. It is not clear whether the parties intended in the Addendum to eliminate well repairs at settlement under ¶ 14. If ¶ 14 was meant not to apply, Lee would have been required only under ¶ 15 to remedy well water contamination. It is not alleged Lee failed to provide satisfactory septic system and well water certificates.

If the provisions in ¶ 14 were meant to apply, then the buyer has the right to a pre-settlement inspection (frequently done as a "walk through") to verify that there has been no material damage or changes necessitating repairs to equipment subsequent to the professional home inspection. If the "well problem" existed at the time of the professional home inspection, the seller is only required to remedy defects reported to him and which he agreed to correct at the time. If the "well problem" occurred after the professional home inspection and the buyer demanded and the seller refused to repair it, then, under subpart (e) of ¶ 14, the buyer may terminate the Contract and obtain a refund of the deposit. The factual allegations pleaded, however, do not allege that Langmaid's personal observations were a pre-settlement inspection that revealed "material damage or changes necessitating repairs" which occurred after the professional home inspection or how "raised concerns" amounted to a specific demand to Lee that Lee refused to carry out by closing and which justified Langmaid's terminating the Contract. Indeed, it is not even alleged that Cobbs Hall was without well water when Langmaid gave his notice on the eve of settlement.

## B. *Lee Cannot Convey the Contracted for Property*

The Complaint alleges Lee breached the Contract because he could not convey the 6.91 acres, 958 feet water frontage, and white sand beach shown on the Keyser survey incorporated by reference into the Contract property description.

Lee demurs to these allegations of breach on the grounds that Langmaid has failed to state a cause of action because (i) the Contract is for a sale of land in gross, not by the acre; (ii) the integration clause in ¶ 26 of the Contract bars consideration of matters outside the document; (iii) there is no survey contingency in the Contract; (iv) the Contract Addendum removing all repair contingencies, except termite and well and septic, removed survey discrepancies; and (v) any acreage discrepancy is explained by inherent variations in the shoreline relating to surveying to mean low water in the two surveys made more than fifteen years apart.

The Court finds that stated grounds (iv) and (v) above are not sufficient to sustain the Demurrer. Variations in acreage due to natural changes in the mean low water line between the time of the Keyser survey and the date of settlement relate to unalleged factual matters that must be shown at trial. As previously stated, the professional home inspection Contract Addendum addressed only physical condition of improvements and equipment; it did not remove the bargain and sale requiring the seller to make, execute, and deliver a deed to the buyer.

Citing *Farrier v. Reynolds*, 88 Va. 141, 13 S.E. 393 (1891), Lee argues that, because the Contract description refers to the 6.91 acres as "more or less" and to the tax map parcel number and street address of the property, the sale is in gross and not by the acre. In *Farrier*, the sale of land described as containing 56 acres, more or less, located on a creek was held by the trial court to be a sale by the acre, not a contract of hazard as to the quantity of land. After purchase, the property surveyed to be 38¾ acres. Other evidence, however, showed that the property, known as the C. B. Duncan Farm, was closed by a fence and was well-known to the buyer who resided in the immediate neighborhood. Moreover, after the land was conveyed and the purchase money paid, the buyer, by a crudely contrived artifice, got the seller to unwittingly sign a paper stating the sale was for 56 acres absolutely. Upon complaint being made, the seller immediately offered to refund the entire purchase price and take back the land, there being a known third party willing to buy the property for the same price the buyer paid. The buyer promptly refused since his scheme was to keep the land valued at what he paid and obtain a windfall abatement of a large part of the purchase price. On such facts, the Virginia Supreme Court of Appeals reversed the trial court, holding the contract to be one of hazard as to quantity of land, not a sale by the acre. Other Virginia cases having different sets of facts have concluded that, unless clearly shown otherwise, a sale of real estate by a contract that states a given number of acres, even if described as "more

or less," will be construed as a sale by the acre. See *Galliher v. Fraher*, 181 Va. 760, 26 S.E.2d 65 (1943), and *Pack v. Whitter*, 110 Va. 122 (1909). The key factor which establishes a sale by the acre is the sale price being the product of the price per acre times the number of acres.

An extensive review of Virginia case law on contracts for the sale of land by the acre is contained in the opinion of Judge John McGrath in *Lewis v. Biller*, 50 Va. Cir. 345 (1999). While cases involving quantity of land typically involve abatement of price, Virginia case law has recognized in some instances a broader deficiency standard applying to title, quantity, or quality of the land, noting that, in such instances, the seller may not be able to force the buyer to take the property. See *Turner v. Holloway*, 146 Va. 827, 132 S.E. 685 (1926).

In *Turner*, the sellers subdivided their large farm and conducted an auction to sell lots. At the auction, the buyers purchased lot 24 of the farm, thought to contain 59.4 acres, at $66.00 per acre and signed a contract to pay $3,920.40. Upon checking the survey, it was ascertained that the lot contained only 56.3 acres. The parties then agreed to reduce the price by $204 based on the $66 per acre price. The auctioneer had made a public announcement at sale that all of lot 24 was suitable for cultivation. Subsequently, the parcel was found to contain only 41½ acres of arable land, the balance being marsh unsuitable for farming as it flooded at high tide. On appeal, the judgment of the trial court applying the $66 per acre price solely to the 41½ acres and allowing an abatement in price for the marsh land was affirmed based on deficiency in the quantity of land holding that the doctrine of abatement for quality did not apply. The Court recognized, however, as "well settled" that, "when there is a deficiency in title, quantity, or quality of the estate, [the vendor] cannot force the vendee to take the property, the option nevertheless rests with the vendee to require the vendor to convey it, or such part of it as he is able to convey, with an abatement of the purchase money for any deficiency." *Turner*, 132 S.E. at 687, citing *Millman v. Swan*, 141 Va. 312, 127 S.E. 166 (1925).

In *Logwood v. Holland*, 131 Va. 186, 108 S.E. 571 (1921), an ordered abatement in the purchase price of mountain land having value as an orchard was affirmed for a discovered shortage of apple trees because such trees were part of the realty and entered into the contract price. The advertisement of sale stated the property had one of the finest old orchards in the state with 500 bearing trees most of which were Albemarle pippins when in fact there were only 332 bearing trees, of which only 126 were the prized Albemarle pippins. The case expressly recognized that, by asking for abatement of price for trees which were "items of special value," the buyer had elected to retain the property and waived his right to rescission of the contract.

The question framed by the allegations in Langmaid's Complaint is of actual or constructive fraud. The Complaint alleges the parties mutually

agreed to a sale by an existing recorded survey. This being a Demurrer, the Court takes as true that the parties did indeed enter into a contract calling for the conveyance of acreage derived from the Keyser survey recorded with Lee's deed, which, by reference, showed a length of water frontage and a white sand beach. It has been long held in Virginia that, where a purchaser of a tract of land agrees to pay so much per acre (or by analogy from case law cited above by some quality of the property that set the price), if he also agrees to take it by a survey already made as fixing the number of acres in the tract without fraud, concealment, or misrepresentation on the part of the vendor, he thereby takes upon himself the risk as to quantity by which he may be a gainer or loser and therefore is not entitled to any compensation for a deficiency. See *Jollife v. Hite*, 5 Va. (1 Call) 301 (1798); *Hall v. Cunningham*, 15 Va. (1 Munf.) 330 (1810); *Fleet v. Hawkins*, 20 Va. (6 Munf.) 188 (1818).

The Contract does not make the purchase contingent upon a satisfactory survey. The Complaint alleges Langmaid relied upon oral misrepresentations by "Mr. Lee, his agent, and his daughter" concerning the acreage, water frontage, and beach shown on the Keyser survey at the time he entered into the Contract. (Comp. ¶¶ 23, 24, 25, 26, & 27.) As alleged, in the conversation with Lee several months after the Contract was signed, Langmaid first learned of the dispute with Benhoff that resulted in the dismantling of Lee's pier. (Comp. ¶¶ 52, 53, & 54.) The Court finds that Langmaid's claims of breach for failure of ability to convey contracted for property are allegations of fraud, concealment, or misrepresentation emanating from non-disclosure of the Benhoff affair, not breach of contract. The factual allegations in the Complaint recounting seller's actual or constructive fraud about the Keyser survey vitiate the integration clause in ¶ 26 of the Contract.

## C. *Title Defect*

The Complaint alleges that the Contract was breached by defect in title based on the same facts as the claim of breach of contract for inability to convey contracted for property. (See Comp. ¶ 71.) The Complaint reiterates the "erroneous property description" of acreage, water frontage, and beach location as shown on the Keyser survey, then alleges that this created a title defect that was not corrected "within 60 days of the parties entering into a corrected Contract, thus entitling [Langmaid] to terminate the [Contract] for the breach thereof." (Comp. ¶ 72.)

Lee demurs to the claim of breach for defect in title on the grounds that (i) the contractual addendum removing contingencies removed the duty of the seller to convey good title; (ii) the Contract was not recorded in the land records of Northumberland County; (iii) Lee was not provided an opportunity to cure any title defect; and (iv) the facts alleged about a title defect do not state a cause of action for breach of contract.

The Court finds no basis for a Demurrer based on Lee's arguments that the removal of contingencies in the home inspection addendum removed the duty of the seller to convey good title nor does the Court find merit in Lee's argument that the non-recordation of the Contract in the county land records abrogated terms of the agreement of the parties. The doctrine by which contract provisions are extinguished by merger into the deed as an instrument of higher dignity is not triggered where, as here, the deed was not recorded. See *Empire Mgmt. & Dev. Co. v. Greenville Assocs.*, 255 Va. 49, 54 (1998).

Langmaid alleges that discrepancies in acreage, water frontage, and beach location are title defects.

The parties' agreement with respect to title is contained in ¶ 13 of the Contract. It requires the buyer to report to the seller defects revealed by examination of title which, if of a nature that can be remedied, are to be cured by the seller within a reasonable time not to exceed sixty days from the seller's receiving notice; otherwise, the buyer has the right to terminate the Contract and get his deposit back. There is no allegation that the title examiner found a defect in the title that was reported to the seller. Furthermore, as the Virginia Supreme Court recognized in *Beck v. Smith*, 260 Va. 452 (2000), title examination places the buyer on notice of only those matters shown by the public land records, but not of matters that are "outside the scope of the title examination and would never have been revealed by title examination." *Id.* at p. 457. The shortcoming in Langmaid's claim of title defect is that title examiners do not certify and title insurance policies do not insure boundaries or any other matters that would be shown by physical inspection or by survey. Title insurance policies do not insure boundaries or matters of survey unless there is submitted with the buyer's application for insurance a current plat of survey of the subject property prepared by a licensed surveyor showing boundary lines, improvements, easements, etc. as shown of record and by the surveyor's physical inspection of the property and a written report of survey certified and signed by the surveyor. Title examiners are not licensed surveyors qualified to certify such matters.

Although Langmaid had the Pruett survey when he gave notice of termination one day before closing, that plat was not part of the title to Cobbs Hall.

### D. *Refusal To Sign Release*

The Contract specifically provides in ¶ 4 (Deposit) that, if the transaction does not settle, the deposit shall be held or disbursed in accordance with the regulations of the Real Estate Board/Commission or other governing law. The matter presently before the Court is determinative of what is the governing law. The Court believes the ultimate resolution of this case necessarily decides this ground.

126

*Analysis of Demurrer to*
*Count Two: Common Law Misrepresentation (Actual Fraud) and*
*Count Three: Negligent Misrepresentation (Constructive Fraud)*

The elements of common law actual fraud are (1) false misrepresentation, (2) of a material fact, (3) intentionally and knowingly made, (4) with the intent to mislead, (5) reliance by the party misled, and (6) resulting in damage to the party misled. *Davis v. Marshall Homes*, 265 Va. 159, 165, 576 S.E.2d 504, 506 (2003). Constructive fraud requires (1) a material misrepresentation of a past or present fact, (2) reasonable reliance by the plaintiff, (3) falsity of fact, (4) injury to the deceived party, and (5) intention however inadvertent, by the maker that the misrepresentation be acted upon. *Mortarino v. Consultant Eng'g Servs., Inc.*, 251 Va. 289, 295, 467 S.E.2d 778, 782 (1996). Constructive fraud differs from actual fraud in that it requires only that one represent as true whatever is really false, however innocently or mistakenly, in such a way to induce a reasonable person to believe it, with the intent that the person will act upon this representation. *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994).

Under either theory of fraud, the element of false misrepresentation may be satisfied by showing the failure of a duty to disclose a material fact where the concealing party knows the other party is acting upon the assumption that the fact does not exist. *Van Deusen v. Snead*, 247 Va. 324, 328, 441 S.E.2d 207, 209 (1994). Any claim of reliance upon a matter falsely represented is subject to the defense of *caveat emptor*. *Kuczmanski v. Gill*, 225 Va. 367 (1984); *Watson v. Avon Street Business Ctr., Inc.*, 226 Va. 614 (1984). This doctrine requires buyers of real estate to exercise ordinary care in inspecting the condition of the property rather than accepting the representations of a party "whose interest it is to misled" the purchasers. *Kuczmanski*, 225 Va. at 369. But, when the buyer obtains information that would "excite the suspicions of a reasonable prudent person," the buyer "must discover for himself the true condition of the premise" even if efforts at fraudulent concealment have been taken. *Armentrout v. French*, 220 Va. 458, 466 (1979).

*Caveat emptor* is itself subject to the doctrine of diversion. "*Caveat emptor* require[s] the purchaser to discover defects in the property which a reasonable inspection would have disclosed, unless the sellers did or said anything to 'divert [the purchasers] from making the inquiries and examinations which a prudent man ought to make'." *Horner v. Ahern*, 207 Va. 860, 864 (1967). A review of *Armentrout, Watson, Horner*, and related cases illustrates that the diversion exception to *caveat emptor* has been found where sellers engaged in affirmative concealment by lying in response to direct questions or by direct acts to conceal the appearance, condition, or even smell which would have alerted the buyer to the problem.

## A. *Actual Fraud*

Lee demurs to the claim of actual fraud on the grounds that (a) the ¶ 26 Contract Integration Clause prevents such claim, (b) no factual allegation is made that Langmaid spoke with Lee or any agent about misrepresentations before signing the Contract, (c) the 1992 Keyser survey does not speak for Lee because it was not done for him, (d) fraud is not pleaded with requisite particularity, (e) *caveat emptor* bars Langmaid, and (f) no facts alleged support actual malice for which punitive damages may be given.

The ¶ 26 Contract Integration Clause already addressed by the Court does not prevent the claims of fraud. The Court will consider together the grounds stated in (b) through (f) above in its analysis.

Fraud must be pleaded with particularity. *Mortarino v. Consultant Eng'g Servs.*, 251 Va. 289 (1996). The allegations must specify the factual circumstances of the time, place and manner by which being given an old survey recorded in the chain of title and answers to several questions asked on a walk of Cobbs Hall perpetrated actual fraud upon Langmaid justifying rescission of the Contract and punitive damages. The statements made to Langmaid during the walk of Cobbs Hall that the sand beach conveyed (the Keyser survey showed a sand beach on Cobbs Hall) and that the pile of materials was from Lee's dismantled pier (a statement not alleged to be false) do not in themselves constitute sufficient allegations of actual fraud. There are, for example, no allegations of walking or inspecting boundary lines or markers or of Lee or his agents diverting Langmaid's attention from such matters. The person who spoke to Langmaid should be identified. The observed pile of materials that was Lee's dismantled pier is not alleged to have discouraged further inquiry by Langmaid nor is it shown that Langmaid's attention was being diverted. There is no allegation that the observed beach was the subject of the dispute with Benhoff. The allegations relate this dispute to Lee's pier. That the seller's agent provided a copy of the Keyser survey to Langmaid in discussions prior to entering into the Contract, even if the survey was said to show boundaries and features of the property and the MLS stated the survey acreage and length of shoreline, do not in themselves constitute sufficient allegations of actual fraud. The matters shown on the Pruett survey were not incidental to any allegations of representations by Lee or his agents because that survey was made subsequent to all discussions.

As alleged throughout the Complaint, the crux of this case is not spoken misrepresentation, but what resulted from silence. Silence alone may act to divert the attention of a person away from actions that would be deemed regularly prudent, such as having one's own survey of the property when informed of a prior boundary dispute. The element of false misrepresentation by silence may result from failure to disclose a material fact where there is a duty to do so and the concealing party knows the other party is acting upon the assumption that the fact does not exist. The high

barrier which must be overcome to establish this type of fraud is shown in *Van Deusen, supra*. As stated in *Bank of Montreal v. Signet Bank*, 193 F.3d 818 (4th Cir. 1999), "the failure to disclose is generally not actionable as fraudulent concealment in the absence of some duty to disclose. A duty to disclose does not normally arise when parties are engaged in an arms length transaction. A duty may arise (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist or (2) if one party takes actions which divert the other party from making prudent investigations, such as making a partial disclosure." *Id*. at p. 394.

Unlike constructive fraud, which may arise simply if a representation is untrue, concealment by silence requires a showing of intent to conceal a material fact. "A concealment of facts, to afford a ground for rescission for fraud, must be a willful suppression of such facts in regard to the subject matter of the contract, which the party making it is bound to disclose." *Rison v. Newberry*, 90 Va. 513, 18 S.E. 916 (1894).

The law on silence constituting concealment as a violation of a duty to inform is expressed in the Restatement (second) of Torts § 551 (1997) as follows:

> One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the non-existence of the matter and he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

If the seller remains silent with respect to something the buyer ought to know, *caveat emptor* still requires that buyer exercise ordinary care in inspecting the condition of the property rather than accepting the representations of a party whose interest is to mislead the purchasers. When the buyer obtains information that would excite the suspicions of a reasonable prudent person, the buyer must discover for himself the true condition of the premise even if efforts at fraudulent concealment have been taken.

The Court agrees that, without a sufficiently alleged claim for actual fraud, a claim for punitive damages cannot be sustained.

## B. *Constructive Fraud*

Lee demurs to the claim of constructive fraud in Count Three on the grounds that (a) the ¶ 26 Contract Integration Clause prevents such claim, (b) there is no sufficient allegation that he relied to his detriment on a statement negligently made by Lee or his agents, (c) any claim of

an innocent or negligent misrepresentation made after the Contract was executed could not have induced Langmaid to enter the Contract, and (d) that, before entering the Contract, Langmaid does not allege he spoke with Lee about the facts he now claims were misrepresentations. Lee also reiterates all of the grounds that he made in his Demurrer to actual fraud.

As opposed to actual fraud, constructive fraud requires only that one innocently or mistakenly represent as true what is really false in a way that induces a reasonable person to his detriment to believe it. Overall, Langmaid argues that Lee, through his agent or daughter, fraudulently induced him *to enter* the Contract and that, several months later, Lee himself fraudulently attempted *to induce him to perform* the Contract. In support of his arguments, Langmaid cites *Ware v. Scott*, 220 Va. 317 (1979).

The *Ware* case factually involved the sale of a home that frequently flooded. In 1972, the year before the sale, the sellers suffered flood damage caused by water overflowing a drainpipe on the lot. In 1973, when the house was listed for sale, the buyer Paige B. Scott, wife of Larry B. Scott, inspected the house and inquired whether "there had ever been any water problems." The seller, Iona A. Ware, wife of Charles C. Ware, replied, "the only water we have had is some seepage from the chimney, but it has been repaired." Mrs. Ware neglected to mention what happened in 1972. On May 23, 1973, after the contract was signed but before closing, the house again flooded for the same reason. Mr. and Mrs. Ware postponed the closing for a month. Mr. and Mrs. Scott did not inspect the house again. When they moved in after the closing, there was a ditch in the front yard and damage to a rock wall on the property, but no visible sign of damage to the house. Mr. and Mrs. Scott found a note from Mrs. Ware stating there had been a "water problem" but the wall and yard would be restored by a contractor who subsequently did the repair. In 1974, the house twice flooded in less than one month for the same reason as before. When Mr. and Mrs. Scott called the fire department to come and pump out the house, they found out from the fire chief that Mr. and Mrs. Ware had gotten the firemen to pump out the house when it flooded on May 23, 1973, just before the scheduled closing.

In *Ware*, the plaintiffs alleged they were fraudulently induced to enter a contract to buy a house. The trial court found that the seller's statement before the contract was signed denying a water problem was not a "material misrepresentation," but that the sellers' concealment afterwards of a subsequent flooding just prior to closing and its consequences was fraudulent and awarded the buyer damages. The sellers appealed, assigning as error that the failure to reveal the flooding which occurred *after* the contract was signed could not possibly have been for the purpose of procuring the contract. The Supreme Court differentiated fraud inducing formation of a contract from fraud inducing its performance, but nevertheless affirmed the trial court, finding that, regardless of whether the sellers' pre-contract denial of prior flooding was an intentional "material misrepresentation,"

such statement was nevertheless erroneous and thus the parties had entered into their contract under a mutual mistake of material fact, making the formation and performance of the contract voidable at the buyer's option.

The allegations about Lee's post contract statements were that he told Langmaid of the dispute with Benhoff which occurred prior to the property even being put on the market, that Benhoff removed a property line marker, and that Lee acquiesced in the dismantling of his own pier. (Comp. ¶¶ 12, 13, 14, 15, 16, & 17.) Langmaid argues that, to induce performance, Lee then made false statements that the beach conveyed with the Property and that he and his children used to find arrowheads in the shallows off the beach. (Comp. ¶ 52.) Additionally it is alleged that Lee when asked why he let his pier be dismantled, "merely shrugged" in response. (Comp. ¶ 54.) Langmaid's characterization of Lee's averments about the beach and arrowheads as a "charade" made to fool him into performing the Contract imply actual rather than constructive fraud. However, if the statements made to Langmaid that the beach conveyed were simply erroneous and reasonably believed and relied upon by him, this may constitute a foundational element of constructive fraud based on mutual mistake.

### Count Four: Injunction

In Count Four, Langmaid incorporates all prior allegations and re-alleges that he is entitled to the return of his deposit based on Lee's breaches of contract in Count One and acts of actual or constructive fraud as alleged in Counts 2 and 3. He re-alleges that, despite his notifying Lee of his breaches of the Contract, none of which were cured, and his actual or constructive misrepresentations about Cobbs Hall, Lee has refused to sign a Release of Contract and return the deposit. As a result, Langmaid avers he has been damaged $100,000, the amount of the escrow deposit.

Lee demurs to Count Four on the grounds that Langmaid has provided no law supporting his claim for an injunction, that he has failed to allege necessary elements such as the lack of an adequate remedy at law and irrevocable injury, and that he has an adequate remedy at law as illustrated by his claims of breach of contract, actual fraud, and constructive fraud in this suit.

Langmaid argues that his claims are extraordinary and that the only way to compel the seller to release the escrow funds is by a mandatory injunction. He asserts that ¶ 25 of the Contract, which refers in part to "a suit to secure the release of any earnest money deposit," contemplates an action for the return of the escrow deposit to him and that, without an injunction, this relief might "fall between the crack(s)" if Lee were to prevail in opposition to the first three Counts of this suit.

Langmaid has failed to state any special statutory basis for an injunction. The purpose of ¶ 25 of the Contract is to allow the prevailing non-defaulting party and the listing and selling brokers to recover in an action brought under

the Contract, in addition to damages, the recovery of reasonable attorney's fees and costs. This contract provision does not provide for injunctions like the claim made in Count Four. Langmaid has failed under §§ 8.01-620 *et seq.* (general injunctive relief) to allege, among other things, lack of an adequate remedy at law and irreparable injury. The adequate remedies at law Langmaid has asserted in Counts 1, 2, and 3 disqualify injunctive relief.

## *Conclusion*

Upon consideration of the foregoing, the Court rules upon the defendant's Demurrer as follows:

Count One: Breach of Contract:
(a) Failure to fix the well, Demurrer sustained, with leave to amend with greater specificity to ¶ 14(b) claim;
(b) Inability to convey the contracted for property, Demurrer sustained;
(c) Title defect, Demurrer sustained;
(d) Refusal to sign release, Demurrer sustained;

Count Two: Common Law Misrepresentation (Actual Fraud) and Count Three: Negligent Misrepresentation (Constructive Fraud):
(a) Actual fraud, Demurrer sustained, with leave to amend with greater specificity actual fraud based on the silence of Lee, his agent, or his daughter concerning the Benhoff dispute wherein there was a duty on the part of the seller or his agents to disclose such information;
(b) Constructive fraud, Demurrer sustained, with leave to amend with greater specificity constructive fraud by mutual mistake;

Count Four: Injunction, Demurrer sustained.

Defendant's demurrers are sustained but with leave to amend as stated above. Mr. Allen shall prepare an Order reflecting the ruling of the Court in this opinion letter. The Order shall provide that, from its date of entry, the plaintiff shall have twenty-one days to file an Amended Complaint. The defendant shall have twenty-one days as allowed under the Rules to file such responsive pleadings as he may be advised. The exceptions of counsel to the ruling of the Court as shown on the record are duly noted.